EXHIBIT A

*SUPREME COURT OF THE STATE OF NEW YORK*
*COUNTY OF NEW YORK*

Index No. 603278/09
Date Purchased 10/28/09
Plaintiff(s) designate(s)
NEW YORK
County as the place of trial.

XENOMICS, INC.,

Plaintiff,

-against-

SEQUENOM, INC.,

Defendant.

The basis of venue is
Plaintiff's address

**SUMMONS**
Plaintiff(s)' address:
420 Lexington Avenue, Suite 1701
New York, New York 10170

To the above named Defendant(s):

*You are hereby summoned* to answer the complaint in this action and to serve a copy of your answer, or if the complaint is not served with this summons, to serve a notice of appearance on the Plaintiff's Attorney(s) within *twenty* days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: New York, New York
October 15, 2009

*JAROSLAWICZ & JAROS, LLC*
Attorneys for Plaintiff
225 Broadway, 24th Floor
New York, New York 10007
(212) 227-2780

By: _____
        *David Jaroslawicz*

Defendant(s) address(es):

SEQUENOM, INC.
3595 John Hopkins Court
San Diego, California 92121

WITH COPY FILE
NOT COMPARED

OCT 28 2009

COUNTY CLERK'S OFFICE
NEW YORK

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------------x

XENOMICS, INC.,                                           Index No.

                         Plaintiff,              **VERIFIED COMPLAINT**

        -against-

SEQUENOM, INC.,

                         Defendant.

------------------------------------------------------------------------x

Plaintiff, by its attorneys, Jaroslawicz & Jaros, complaining of the defendants, upon information and belief, alleges as follows:

## THE PARTIES

1.      At all times hereinafter mentioned, plaintiff is a corporation, duly organized and existing under and by virtue of the laws of the State of Florida, with its principal place of business in the State of New York.

2.      At all times hereinafter mentioned, the plaintiff was the owner of certain valuable patents as set forth in Exhibit A.

3.      At all times hereinafter mentioned, upon information and belief, the defendant Sequenom, Inc. is a corporation, duly organized and existing under and by virtue of the laws of the State of Delaware, with its principal place of business in the State of California.

4.      Defendant is a publicly traded company on the NASDAQ, trading under the symbol SQNN.

5.     At all times hereinafter mentioned, the defendant held itself out as a highly competent biotech company with a research and development department with respect to, among other things, non-invasive testing for Down Syndrome; the test was known as SEQureDx™ (hereinafter referred to as defendant's "Down Syndrome test").

## *THE UNDERLYING FACTS*

6.     Plaintiff had certain patents which would enable the defendant to develop and market its Down Syndrome test.

7.     On or about October 29, 2008, the plaintiff and defendant entered into a licensing agreement whereby defendant would be given exclusive rights to plaintiff's patents set forth in Exhibit A. A copy of that agreement is annexed hereto as Exhibit B.

8.     Pursuant to the terms of the agreement, particularly ¶3.1 thereof, plaintiff received a small up-front payment.

9.     In addition to the small up-front payment, plaintiff was receive royalties equal to six percent (6%) of the net sales revenues received by the defendant, net licensing and other revenues received by the defendant.

10.     Plaintiff was also to receive various other benefits, including minimum royalties.

11.     As a publicly traded company, the defendant was required to, and did, file various press releases and statements with the Securities & Exchanges Commission ("SEC").

12.     On June 4, 2008, defendant issued a press release entitled, *"Sequenom Announces Results of Screening Studies for Down Syndrome and Updates Development of*

2

*Noninvasive Prenatal Diagnostics at Analyst and Investor Briefing*" (Exhibit C), touting the test in question.

13.     On June 23, 2009, defendant announced it was raising over $85 million in a public offering based in part on its representations as to the status of its test program, particularly its non-invasive Down Syndrome testing (Exhibit D).

14.     On September 23, 2008, defendant issued a press release entitled, "*Sequenom Announces Additional Positive Results for Down Syndrome Test at Analyst Briefing*" (Exhibit E), again touting the test in question.

15.     It was in reliance upon these press releases and SEC filings, and by the defendant making similar misrepresentations, and other statements made by the defendant's representatives to the plaintiff, the plaintiff agreed to enter into the licensing agreement with the defendant on October 29, 2008 (Exhibit B).

16.     Defendant maintained the charade that it had valid testing procedures:

(a)     On December 1, 2008, defendant issued a press release entitled, "*Next-Generation Technology Shown to Accurately Detect Fetal Down Syndrome in First Trimester of Pregnancy*" (Exhibit F).

(b)     On January 28, 2009, defendant issued a press release entitled, "*Sequenom Announces New Positive Data on Down Syndrome Detection and Unveils Breakthrough DNA Approach to Prenatal Diagnostics – Data Continue to Support Significant*

3

*Market Potential for Sequenom Prenatal Franchise; Down Syndrome Test on Track for Launch in June 2009"* (Exhibit G).

(c)   On February 3, 2009, defendant issued a press release entitled, *"Sequenom Announces Findings on Methylation Markers and RNA-SNP Markers as Presented at SMFM -- Company Provides Additional Details on SEQureDx Trisomy 21 Technology Performance Data"* (Exhibit H), again touting the test in question.

17.   Suddenly, on April 29, 2009, defendant admitted that its representations had been fraudulent by issuing a new press release entitled *"Sequenom Announces Delay in Launch of SEQureDx Trisomy 21 Test"* (Exhibit I).

18.   Thereafter on May 1, 2009, defendant filed a Form 8-K with the SEC stating that several class action complaints had been filed against it as a result of its misrepresentations with respect to its Down Syndrome test (Exhibit J).

19.   On May 22, 2009, plaintiff wrote to the defendant (Exhibit K) requesting the return of the license for the technology and patents and any damages which had been suffered.

20.   Defendant's counsel responded with an arrogant letter (Exhibit L), claiming that despite the documentation and admission by the defendant, the defendant had done nothing wrong.

21.   On September 28, 2009, defendant fired five employees, including the president and chief executive officer Harry Stylli; the senior vice president of research and development Elizabeth Dragon; the names of the other persons who were fired were not released. In addition,

4

several other persons left the defendant's employ, including Paul Hawran, the chief financial officer, and Steven A. Ownings, vice president of Commercial Development.

22.     The above followed an internal investigation by the defendant overseen by the law firm, Sheppard, Mullin, Richter & Hampton, which claims to have interviewed over forty witnesses and reviewed over three hundred thousand documents.

23.     On September 28, 2009, the defendant announced that the FBI and U.S. Attorney had requested to meet with the defendant and were investigating it and what had occurred with respect to its alleged successful Down Syndrome test; defendant filed a Form 8-K with the SEC on October 5, 2009 (Exhibit M).

24.     Plaintiff relied upon the fact that defendant was fully funded and would be able to complete its testing and research and would be able to continue to raise money as needed in the future based on of the fraudulent representations it was issuing as to its program and tests and the raising of $85 million based upon these representations.

25.     In an interview on October 6, 2009, Ian Clements, head of corporate communications for the defendant, announced that the T-21 Down Syndrome testing had a projected market of possibly as high as a billion dollars.

## AS AND FOR A FIRST CAUSE OF ACTION

26.     Had the defendant not fraudulently misrepresented the status of its testing for Down Syndrome, plaintiff never would have entered into an agreement with the defendant and given the defendant exclusive license to plaintiff's patents (Exhibit A).

5

27. Defendant's misrepresentations were material, willful and deliberate, as documented by its own internal investigation, its press releases and Form 8-K's annexed hereto.

28. It has become apparent, in light of defendant's fraudulent conduct, that the defendant has no real non-invasive testing for Down Syndrome, and the numerous class actions against the defendant and the officers involved in the fraud, that defendant's ability to raise funds has been greatly impaired; that the defendant may no longer be a viable entity, and certainly will not have the funds necessary to continue testing, and had plaintiff known of this, it never would have entered into an agreement with the defendant.

29. By reason of the defendant's conduct, plaintiff has been damaged in that it cannot and will not receive royalties; It was induced to part with valuable exclusive patents and licensing rights; its reputation has been adversely affected; and plaintiff has been otherwise damaged.

30. By reason of the foregoing, plaintiff is entitled to recover all of its damages, together with punitive damages for defendant's willful fraud, in an amount not to exceed the sum of Three Hundred Millions Dollars ($300,000,000).

## AS AND FOR A SECOND CAUSE OF ACTION

31. Plaintiff repeats, reiterates and realleges each of the foregoing allegations with the same force and effect as if more fully set forth at length herein.

6

32. Based upon the defendant's fraudulent conduct as set forth above, plaintiff was induced to enter into an agreement dated October 29, 2008 (Exhibit B), giving up various valuable patent rights.

33. Due to the defendant's inequitable conduct and fraud, plaintiff is entitled to rescind that agreement and to have the court deem it null and void so that the plaintiff can license its patents to a legitimate company or develop its own products without being hampered by an agreement with the defendant which was fraudulently obtained by the defendant through its fraudulent conduct.

## AS AND FOR A THIRD CAUSE OF ACTION

34. Plaintiff repeats, reiterates and realleges each of the foregoing allegations with the same force and effect as if more fully set forth at length herein.

35. Defendant has breached the agreement entered into between the parties by fraudulently misrepresenting the status of the company, particularly as to its Down Syndrome test, and other misrepresentations and fraudulent conduct as set forth above.

36. Plaintiff would never have entered into an agreement providing for royalties and licensing fees which were, in essence, non-existent and will never be paid by the defendant because its entire representation was fraudulent.

37. By reason of the defendant's breach of the agreement, plaintiff has been damaged as set forth above.

7

38.   By reason of the foregoing, plaintiff is entitled to recover all of its damages from

the defendant.

WHEREFORE, plaintiff demands judgment against the defendant, to recover for all of

its damages, including punitive damages, all together with the costs and disbursements of this

action.

> JAROSLAWICZ & JAROS, LLC
> Attorneys for Plaintiff
> 225 Broadway, 24th Floor
> New York, New York 10007
> (212) 227-2780
>
> By: _____
>      David Jaroslawicz

8

DAVID JAROSLAWICZ, a member of the firm of JAROSLAWICZ & JAROS, attorneys for the plaintiff(s) in the within action, duly admitted to practice in the Courts of the State of New York, affirms the following statements to be true under the penalties of perjury, pursuant to Rule 2016 of the CPLR:

That he has read the foregoing *Complaint* and knows the contents thereof; that the same is true to his own knowledge except as to those matters therein stated to be alleged upon information and belief, and that as to those matters, he believes them to be true.

Affiant further states that the source of his information and the grounds of his belief are derived from the file maintained in the normal course of business of the attorneys for the plaintiff(s).

Affiant further states that the reason this affirmation is not made by the plaintiff(s) is that at the time this document was being prepared, the plaintiff(s) was (were) not within the County of New York, which is the County where the attorney for the plaintiff(s) herein maintains his office.

Dated:     New York, New York
           October 15, 2009

DAVID JAROSLAWICZ

EXHIBIT A

Execution Version

Exhibit A

## Licensed Patents

| Application Number (Priority Application Number) | Patent Number | Filing Date | Title |
|---|---|---|---|
| 09/230,704 (PCT/US98/10965) | US 6,251,638 | Feb. 4, 2000 | Methods for detection of nucleic acid sequences in urine |
| 10/992,639 Reissue of 09/634,732 (09/230,704) (09/609,162) (PCT/US98/10965) | US RE39,920 | Nov. 19, 2004 | Methods for detection of nucleic acid sequences in urine |
| EP 98924998.2 (PCT/US98/10965) | EP 0920539 (B1, B9) | May 29, 1998 | Methods for detection of nucleic acid sequences in urine |

EXHIBIT B

Execution Version

## LICENSE AGREEMENT

THIS LICENSE AGREEMENT is made as of the 29th day of October, 2008 (the "**Effective Date**"), by and between Sequenom, Inc., with its principal place of business at 3595 John Hopkins Court San Diego, California ("**SEQUENOM**") and Xenomics, Inc., with its executive offices at 420 Lexington Avenue, Suite 1701, New York, NY 10170 ("**XENOMICS**").

### RECITALS

**WHEREAS**, XENOMICS owns the Licensed Patents set forth on Exhibit A; and

**WHEREAS**, SEQUENOM wishes to obtain a license from XENOMICS under the Licensed Patents, and XENOMICS wishes to grant such a license to SEQUENOM, to certain specified rights under the Licensed Patents within the Field.

**NOW THEREFORE**, for and in consideration of the covenants, conditions and undertakings hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, SEQUENOM and XENOMICS agree as follows:

### AGREEMENT

1.     **DEFINITIONS.** All defined terms in this Agreement shall have the meaning assigned to them in this Section 1 or elsewhere in this Agreement and shall apply both to the plural and singular forms of each term, as the context may require. "**1/including**" means "including without limitation." "**Days**" refers to calendar days unless otherwise specified. "**H/herein**," "**hereof**," "**hereunder**" or similar expressions refer to this Agreement in its entirety. "**Section**" means the referenced section herein, unless otherwise stated. SEQUENOM and XENOMICS are sometimes collectively referred to herein as the "**Parties**" and individually as a "**Party**." "**Exhibit**" refers to Exhibit A appended and incorporated into this Agreement.

     1.1.     Agreement. "**Agreement**" means this License Agreement and Exhibit A.

     1.2.     Affiliate. "**Affiliate**" means, with respect to any Person, at the time in question, any other Person that directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with such Person. For purposes of this definition, "**control**" (including the terms "**controls**," "**controlled by**" and "**under common control with**") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether by contract, through the ownership of voting securities or otherwise.

     1.3.     Combination Product. "**Combination Product**" means a product that contains a Licensed Product component and at least one other product(s) or process(es) which is a functional component that: (a) is not itself a Licensed Product; and (b) adds material value to the Combination Product. For example, a Licensed Product sold in combination with one or more other products, materials, or services is a Combination Product.

1.4.   Field.   "Field" means any prenatal diagnostic, prenatal prognostic or prenatal analysis, use, method, service or product within the scope of the Licensed Patents for research, laboratory developed tests and *in vitro* diagnostic markets. The Field expressly excludes analyses, uses, methods, services and products in which the purpose of the prenatal analysis is fetal gender determination solely by Y-chromosome detection.

1.5.   Licensed Patents.   "Licensed Patents" means the patents and applications listed in Exhibit A; all patent applications that claim priority from the same application(s) that such patents claim priority, all patents issuing from such applications, and all reissues, reexaminations, and extensions and the like, as well as any foreign counterparts with respect to the foregoing.

1.6.   Licensed Diagnostic Products.   "Licensed Diagnostic Products" means any product manufactured, used or sold, or service provided for any diagnostic purposes, by SEQUENOM, or its distributors or Sublicensees, that, but for the Agreement, would infringe a Valid Claim of the Licensed Patents in the jurisdiction in which the product or service is made, used or sold pursuant to the Exclusive License granted hereunder; provided that such product or service is not a Licensed Research Product.

1.7.   Licensed Research Products.   "Licensed Research Products" means any product manufactured, used or sold, or service provided for any research purposes by SEQUENOM, or its distributors or Sublicensees, that, but for the Agreement, would infringe a Valid Claim of the Licensed Patents in the jurisdiction in which the product or service is made, used or sold pursuant to the Exclusive License granted hereunder.

1.8.   Licensed Products.   "Licensed Products" refers collectively to Licensed Diagnostic Products and Licensed Research Products.

1.9.   Net Licensing Revenues.   "Net Licensing Revenues" means all payments received by SEQUENOM from the sublicensing of the Licensed Patents to a Sublicensee in accordance with this Agreement, less five percent (5%) of such amounts for administrative overhead.

1.10.   Net Sales.   "Net Sales" means the total gross payments received by SEQUENOM and its Affiliates (and not by a Sublicensee of SEQUENOM or other third party), for sales of Licensed Products and from leasing, renting, or otherwise making Licensed Products available to others by other disposition, whether invoiced or not, less: returns and allowances, packing costs, insurance costs, freight out, taxes or excise duties imposed on the transaction, and wholesaler and cash discounts in amounts customary in the trade to the extent actually granted or realized. No deductions shall be made for commissions paid to individuals, whether they be with independent sales agencies or regularly employed by SEQUENOM or an Affiliate, and on its payroll, or for the cost of collections.

1.11.   Combination Products.   If a Licensed Product is sold in combination with other products, materials, or services (a "Combination Product"), only that portion of the sales price of the Combination Product that is reasonably attributable to the Licensed

2

Product will be included in Net Sales. Net Sales for a Combination Product means the Net Sales generated from the Combination Products, multiplied by a proration factor that is determined as follows: (a) If all components of the Combination Product were sold separately during the same or immediately preceding Royalty Period, the proration factor shall be determined by the formula $[A/(A+B)]$, where A is the aggregate gross sales price of all Licensed Product components during such period when sold separately from the other essential functional components, and B is the aggregate gross sales price of the other essential functional components during such period when sold separately from the Licensed Product Components; or (b) in the case where the components of the Combination Product are not available for sale as stand-alone products, SEQUENOM and XENOMICS shall negotiate in good faith the proration factor.

1.12.    Person. "Person" means any natural person or any legal, commercial or governmental entity, such as, but not limited to, a business association, corporation, general partnership, joint venture, limited partnership, limited liability company, trust, or any person acting in a representative capacity.

1.13.    Royalty Quarter. "Royalty Quarter" means each successive or applicable period of three fiscal months ending March 31, June 30, September 30 or December 31 (or a shorter period running from the Effective Date to the first such date).

1.14.    Sublicensee. "Sublicensee" means any Person to whom a Party grants a sublicense of some or all of the rights granted to such Party under this Agreement.

1.15.    Valid Claim. "Valid Claim" shall mean a claim of an issued and unexpired patent included within the Licensed Patents, which has not been held permanently revoked, unenforceable or invalid by a decision of a court or other governmental agency of competent jurisdiction, unappealable or unappealed within the time allowed for appeal, and which has not been admitted to be invalid or unenforceable through opposition, reexamination, reissue or disclaimer.

1.16.    XENOMICS Know-How. "XENOMICS Know-How" means any non-patentable technical information developed or discovered by XENOMICS in the Field in which XENOMICS has a licensable interest as of the Effective Date or during the Term that is useful for the development, manufacture or effectiveness of the Licensed Products or the use of the Licensed Patents in the Field.

## 2.    GRANT

2.1.    Grant of License to SEQUENOM. XENOMICS hereby grants to SEQUENOM and its Affiliates an exclusive (even as to XENOMICS), worldwide, non-transferable (except as provided in Section 12.1) license, including the right to grant sublicenses, under the Licensed Patents and XENOMICS Know-How to make, have made, use, have used, offer to sell, sell, have sold, import, have imported, export, have exported, and otherwise commercially exploit the Licensed Products in the Field (collectively, the "Exclusive License"). For purposes of clarity, the scope of such Exclusive License shall not include any rights under the Licensed Patents or XENOMICS Know-How relating to fetal gender determination made solely by detection of Y-chromosome (the "Limited Fetal

3

Gender Test"),  However, material modifications to the Limited Fetal Gender Test assay which relate to the development and use of fetal identifying or other markers for the verification of a female fetus and/or different markers for the verification of a male fetus are specifically included in the Exclusive License grant to SEQUENOM. In the event that,upon the expiration of any concluded business arrangement currently under negotiation with third parties regarding the Limited Fetal Gender Test, XENOMICS obtains the legal rights to include marketing, distribution, use, or other rights for the Limited Fetal Gender Test in the Exclusive License at any time during the Term, XENOMICS will promptly expand the Exclusive License, at no additional consideration, to include such rights therein, to the extent that such inclusion does not contravene any applicable law or regulation or result in the breach of any obligation of XENOMICS to any third party.

2.2.    Sublicenses. SEQUENOM may grant sublicenses to the Licensed Patents and XENOMICS Know-How for Licensed Products in the Field which may be co-extensive with the Exclusive License, provided that the Sublicensee has obligations at least as restrictive as those imposed herein on SEQUENOM, excluding any economic terms, which may be freely negotiated between SEQUENOM and the Sublicensee. Within ten (10) business days of any sublicense, SEQUENOM shall notify XENOMICS in writing of the name and address of the Sublicensee, the technology sublicensed and the Licensed Patents and Licensed Products to which such technology relates, the applications and scope of the sublicense, and the duration of the sublicense.

2.3.    Right Of First and Exclusive Period of Negotiation. XENOMICS hereby grants to SEQUENOM during the Term the exclusive right to review any new data developed by XENOMICS relating to cancer indications ("New Technology") and the exclusive right to negotiate a joint collaboration and/or license agreement with respect to such New Technology as set forth below. XENOMICS will timely provide written notice (the "Offer Notice") of such New Technology to SEQUENOM, which notice shall include a description of such data and the scope of the offer to negotiate provided by XENOMICS. SEQUENOM will respond in writing within 45 days of receipt of the Offer Notice as to its acceptance or rejection of the offer to negotiate described in the Offer Notice. If timely accepted by SEQUENOM, XENOMICS and SEQUENOM will have a 60-day period from the date of SEQUENOM's acceptance in which to conduct good-faith negotiations toward the conclusion of a mutually acceptable marketing, commercialization and/or development arrangement. Should SEQUENOM opt not to pursue negotiations within the 45-day offer period, or should the Parties fail for any reason to reach agreement in the 60-day negotiation period, the offer to SEQUENOM shall expire, and XENOMICS shall be free to exercise any and all of its rights in and to the New Technology, including the right freely to license such New Technology to third parties. If such failure to reach agreement pursuant to the preceding sentence results from SEQUENOM's rejection of terms firmly offered by XENOMICS, then any such license to a third party shall be on terms that are no more favorable to such third party than those offered to SEQUENOM. For the avoidance of doubt, neither Party shall be required to enter into any such joint collaboration and/or license agreement with respect to any New Technology unless and until the terms and conditions of such agreement are acceptable to it in its sole and absolute discretion.

4

2.4.     Marking. SEQUENOM shall, consistent with prevailing business practices, mark and cause its Sublicensees to mark all Licensed Products that are manufactured or sold under this Agreement, as well as any related advertising or promotional materials, with the number of each issued patent within the Licensed Patents that applies to such product (or, where applicable, "Patent Pending"), as well as an indication that the Licensed Products are made pursuant to a license from XENOMICS.

2.5.     Reserved Rights. No license or reservation of rights is granted or reserved to or by a Party, unless it is specifically set forth herein. No other license or right is or shall be deemed to be granted, whether by implication, estoppel, inference or otherwise, by or as a result of this Agreement or any conduct of any Party under this Agreement.

## 3.     UP-FRONT FEE AND EQUITY INVESTMENT

3.1.     Up-Front License Fee. SEQUENOM agrees to pay to XENOMICS an up-front license fee of one million dollars ($1,000,000) payable in two equal installments:  five hundred thousand dollars ($500,000) shall be paid within five (5) days of the Effective Date, and an additional five hundred thousand dollars ($500,000) shall be paid on or before January 7, 2009.

3.2.     Issuance of Warrants. Concurrently with the Parties' entry into this Agreement, XENOMICS shall issue and deliver to SEQUENOM a warrant (the "Warrant") to purchase an aggregate of 438,596 shares of the Company's common stock, par value $0.001 per share (the "Common Stock") in the form attached hereto as Exhibit B with an exercise price equal to $0.75 per share of Common Stock, subject to adjustment as set forth in the Warrant.

## 4.     ROYALTIES

4.1.     Licensed Diagnostic Products. SEQUENOM shall pay to XENOMICS, within forty-five (45) days following the end of each Royalty Quarter, royalties equal to six percent (6%) of:  (a) the Net Sales revenue received by SEQUENOM during such Royalty Quarter for Licensed Diagnostic Products sold by SEQUENOM or its Affiliates; and (b) Net Licensing Revenues received by SEQUENOM during such Royalty Quarter from Sublicensees in the form of royalties for the Licensed Diagnostic Products.

4.2.     Licensed Research Products. SEQUENOM will pay to XENOMICS, within forty-five (45) days following the end of each Royalty Quarter, royalties equal to one percent (1%) of:  (a) the Net Sales revenue received by SEQUENOM during such Royalty Quarter for Licensed Research Products sold by SEQUENOM or its Affiliates; and (b) Net Licensing Revenues received by SEQUENOM during such Royalty Quarter from Sublicensees in the form of royalties for the Licensed Research Products.

4.3.     Minimum Royalties. SEQUENOM will be responsible for the annual minimum royalty payments set forth below commencing with the second year of this Agreement (i.e., the calendar year ending on December 31, 2010; for purposes of this Section 4.3, each twelve- (12) month period commencing on January 1, 2009, is a "Year"). Minimum royalties will be paid within sixty (60) days of the close of the Year in which the

royalty accrued, and will be paid less any amounts of royalties already paid to XENOMICS for such Year. Minimum royalties per Year are as follows: Year 2, $75,000; Year 3, $100,000; Year 4, $150,000; Year 5 and thereafter, $250,000. It is understood that the minimum royalties will apply on a calendar year basis, and that sales of Licensed Products requiring the payment of earned royalties made during a prior or subsequent calendar year shall have no effect on the annual minimum royalty due XENOMICS for any given calendar year. In the event that SEQUENOM fails to generate sufficient combined revenues from Net Sales and Net Licensing Revenues to cover 90% of the minimum royalty in two (2) consecutive years beginning in Year 4, and provided that there is not a fundamental technical failure inherent in the methodology as related to the Field, XENOMICS shall be entitled, with 30 days written notice to SEQUENOM, to (i) convert the Exclusive License to a non-exclusive license; or (ii) terminate this Agreement, in XENOMICS' sole discretion. It is understood that any failure by SEQUENOM to pay the minimum royalty in full for any given Year when due and payable shall constitute a material breach subject to the procedures set forth in Section 10.2.

4.4.    No Multiple Royalties. No multiple royalties will be payable due to any Licensed Product being covered by more than one of the Licensed Patents.

4.5.    Third-Party Royalties. If SEQUENOM pays royalties to any third party (other than an Affiliate) for the right to make, have made, use, have used, market or have marketed, sell or offer to sell, import, have imported, export or have exported a Licensed Product, then SEQUENOM will be entitled to deduct from all royalty payments due to XENOMICS hereunder the amount of such royalties actually paid to such third party, up to a maximum amount of forty percent (40%) of the royalties that would otherwise be due to XENOMICS in the absence of such third-party royalties.

4.6.    Taxes. SEQUENOM shall be responsible for sales, use, excise, VAT and similar taxes (expressly excluding taxes based on XENOMICS' income), if any, imposed by any governmental authority on the royalty payments made by SEQUENOM to XENOMICS hereunder or the sale of Licensed Products by SEQUENOM and its Affiliates and all sublicensing revenues received by SEQUENOM from Sublicensees. If any taxes are required by any governmental authority to be withheld on any payment made by SEQUENOM to XENOMICS hereunder, SEQUENOM shall pay the relevant taxation authority the minimum amounts necessary to comply with the applicable law, and shall make such payment prior to the date on which the interest or penalty is attached thereto. SEQUENOM shall promptly deliver to XENOMICS an official receipt, or other documentation reasonably requested by XENOMICS, as evidence of such taxes.

4.7.    Records and Reporting. SEQUENOM will keep complete, true, and accurate records of (1) all Net Licensing Revenues received by it from each Sublicensee of the Licensed Patents and (2) all Net Sales. The records shall be in such form as is required for the computation and verification of the amounts of royalties to be paid hereunder. During the Term, SEQUENOM shall furnish to XENOMICS a quarterly written report (the "Royalty Calculation Report") showing in reasonably specific detail: (i) the gross sales of Licensed Products and the gross Licensing Revenues received by SEQUENOM and its Affiliates and Sublicensees during the reporting period and the calculation of Net Sales from

6

such gross revenues and (ii) the withholding taxes, if any, required by law to be deducted in respect of such sales and (iii) the exchange rates used in determining the amount of Dollars.

4.8.    Audit. SEQUENOM will permit, at XENOMICS' expense, a mutually acceptable independent auditor selected by XENOMICS to confidentially examine SEQUENOM's books and records not more than once in any twelve (12) month period in order to verify the payments due or owed under this Agreement. Such auditor will be authorized to communicate to XENOMICS only whether the payments which have been made are correct, and if not, the amount(s) of any discrepancy(ies) and when such discrepancy(ies) occurred. SEQUENOM shall pay the additional payments required within thirty (30) days of the date XENOMICS delivers to SEQUENOM such auditor's written report so demonstrating. In the event that a particular audit shows that payments made by SEQUENOM are at least five percent (5%) below the correct amount that was due, SEQUENOM will reimburse XENOMICS for the cost of that audit.

4.9.    Confidential Financial Information. XENOMICS shall treat all financial information subject to review under Section 4.8 or under any sublicense agreement as confidential and shall cause its auditor to retain all such financial information in confidence.

5.    PAYMENT

5.1.    Manner of Payment. Payments to be made by under this Agreement will be payable solely in United States Dollars and will be paid by bank wire transfer in immediately available funds to such bank account as is designated in writing by XENOMICS from time to time. All banking charges incurred in connection with any remittance under this Agreement shall be borne by the Party making such remittance and shall be added to, and not deducted from, the amount of such remittance.

5.2.    Interest on Late Payments. Any payments due hereunder that are not paid on or before thirty (30) days after the date such payments are due under this Agreement will bear interest at a rate per month equal to the prime rate as published from time to time, calculated on the total number of days payment is delinquent; *provided, however,* that interest will accrue pursuant to this Section 5.2 commencing on the date on which payment became delinquent, but shall not be payable to the extent that the Party disputing its obligation to pay prevails in the resolution of such dispute.

6.    INTELLECTUAL PROPERTY

6.1.    Ownership. SEQUENOM hereby acknowledges that, as between SEQUENOM and XENOMICS, the Licensed Patents, the Confidential Information of XENOMICS and all intellectual property rights therein are proprietary to XENOMICS and XENOMICS owns all right, title, and interest therein (except for the license expressly set forth in this Agreement). SEQUENOM shall not at any time, directly or indirectly, challenge XENOMICS' rights in respect of or assert any ownership interest or title in or to the Licensed Patents or the Confidential Information of XENOMICS.

6.2.    Patent Prosecution and Maintenance. XENOMICS, using patent attorneys selected by it, but reasonably acceptable to SEQUENOM, shall diligently apply for, seek

7

issuance of and maintain the Licensed Patents during the Term in the United States and in such other countries and treaty regimes where the Licensed Patents are pending, at the expense of SEQUENOM, if SEQUENOM elects to secure such patent rights, and unless otherwise agreed to in writing by the Parties. SEQUENOM shall be provided with copies of all documents relating to the filing, prosecution, and maintenance of XENOMICS' Licensed Patents. SEQUENOM shall be given at least thirty (30) days to advise and comment upon such filings and actions planned to be taken by XENOMICS. SEQUENOM's advice and comments will be given due, but not binding, consideration by XENOMICS. Thereafter, XENOMICS shall use all reasonable efforts to implement such strategy, including amending any patent application to include claims reasonably requested by SEQUENOM to protect products and/or processes contemplated to be used or sold under this Agreement. XENOMICS shall not, without mutual agreement with SEQUENOM, abandon the subject matter of any claim initially presented in any of XENOMICS' Licensed Patents. XENOMICS will endeavor to obtain patent protection in the U.S. and ex-U.S. (foreign) countries if available and if SEQUENOM so elects and notifies XENOMICS of such election sufficiently in advance of the applicable bar date to permit XENOMICS to obtain such patent protection with commercially reasonable efforts. SEQUENOM shall, as applicable, notify XENOMICS at least two (2) months prior to a foreign bar date of its election to obtain foreign patents, unless SEQUENOM has less than two (2) months notice of the foreign bar date, in which case SEQUENOM will make such an election as soon as practicable after becoming aware of the foreign bar date. XENOMICS shall have no responsibility or liability to SEQUENOM in the event that XENOMICS is unable to obtain any such foreign patent, after its reasonable best efforts to do so, due to SEQUENOM's failure to provide such notice sufficiently in advance of such bar date. This notice concerning foreign filing shall be in writing, shall identify the countries desired, and shall reaffirm SEQUENOM's obligation to underwrite the costs thereof. The absence of such a notice from SEQUENOM to XENOMICS shall be considered an election not to secure foreign rights in the countries not included in the required notice. XENOMICS shall have the right to file patent applications at its own expense in any country, including the U.S., and such applications and resultant patents shall not be subject to this Agreement. Except as otherwise provided herein, XENOMICS agrees not to license such applications and resultant patents to a third party in the Licensed Field without first offering to SEQUENOM an opportunity to add such applications to this Agreement for additional consideration.

6.3.    Infringement of Licensed Patents by Third Parties. In the case of any infringement of any Licensed Patent by any third party (an "Infringer") during the Term, SEQUENOM shall have the first right, but shall not be obligated, to prosecute, at its own expense, any infringements of the Licensed Patents, to defend and otherwise enforce the Licensed Patents and to recover, for its own account, any damages, awards or settlements resulting therefrom. The Parties agree to consult with each other, prior to the commencement of any legal proceedings, as to the most effective way of pursuing such matter. Should SEQUENOM not take action against an Infringer within three (3) months of any written request by XENOMICS to do so or should SEQUENOM take action against an Infringer in a manner, in the reasonable judgment of XENOMICS, that is insufficient to protect XENOMICS' rights granted hereunder, provided SEQUENOM does not reasonably object, XENOMICS will have the right, but not the obligation, to enforce, at its own expense, a Licensed Patent against an Infringer in the Field. The Party not bringing an

8

Execution Version

action against an Infringer will assist the Party bringing such action as reasonably requested, at its own expense, in taking any such action against any such Infringer, including joining and being named as a party to any suit against an Infringer. The Party bringing an action hereunder will keep the other Party reasonably informed of all significant developments with regard to actions being taken against an Infringer. SEQUENOM will not settle or compromise any suit or action against an Infringer without the written consent of XENOMICS, which consent will not be unreasonably withheld or delayed, and XENOMICS will not settle or compromise any suit or action against an Infringer relevant to the Field without the written consent of SEQUENOM, which consent will not be unreasonably withheld or delayed. Any amount recovered as a result of any action taken pursuant to this Section (the "Award") will be first applied to reimbursing each Party for its out-of-pocket expenses incurred in connection therewith; provided that, if the Award is less than the total out-of-pocket expenses incurred by both Parties, then the Award will be divided between the Parties pro rata based on the percentage of total expenses incurred by each Party. The remainder of the Award, if any, will be retained by the Party bringing the action against the Infringer; provided, however, that to the extent the relevant infringement occurred in the Field, SEQUENOM will retain any such relevant remainder.

## 7.   REPRESENTATIONS, WARRANTIES AND COVENANTS

7.1.    Representations, Warranties and Covenants of XENOMICS.  XENOMICS represents, warrants, and covenants to SEQUENOM for the duration of the Term all of the following:

(1)    XENOMICS is a corporation duly organized, validly existing and in good standing under the laws of the state of Florida with corporate power and authority adequate for executing, delivering, and performing its obligations under this Agreement;

(2)    This Agreement has been duly executed and delivered by XENOMICS and is a legal, valid and binding obligation of XENOMICS;

(3)    The execution, delivery and performance of this Agreement by XENOMICS, and the rights and licenses granted to SEQUENOM herein, do not and will not contravene any provision of the charter document or by-laws of XENOMICS or any agreement or other obligation of XENOMICS or the right of any third party;

(4)    No invention claimed in the Licensed Patents was sponsored or is owned or controlled by the United States Government, by any other government or authority in any other country or jurisdiction, or by any funding or other agency or instrumentality of any of the foregoing. The rights granted herein to SEQUENOM under the Licensed Patents are not subject to any rights of the United States Government under 35 U.S.C. §§ 200-212 or any similarly laws of any other jurisdiction or treaty;

9

Execution Version

(5)   XENOMICS agrees that it will not assert nor cause to be asserted against SEQUENOM or its Affiliates any intellectual property right that is or might be infringed by reason of any activities of SEQUENOM or its Affiliates that are carried out (i) in performance of SEQUENOM's obligations under this Agreement or in exercise of SEQUENOM's rights under this Agreement and (ii) in full compliance with the terms and conditions of this Agreement.

(6)   XENOMICS has not granted and will not grant licenses or other rights to any third party to the Licensed Patents in the Field.

(7)   XENOMICS has the sole right to exclusively license the Licensed Patents and has taken all necessary steps and obtained all necessary consents and approvals under any other agreement that may be required for the implementation of this Agreement.

7.2.   Representations, Warranties and Covenants of SEQUENOM.
SEQUENOM represents, warrants, and covenants to XENOMICS for the duration of the Term all the following:

(1)   SEQUENOM is a corporation duly organized, validly existing and in good standing under the laws of Delaware with corporate power and authority adequate for executing, delivering, and performing its obligations under this Agreement;

(2)   The execution, delivery and performance of this Agreement have been duly authorized by all necessary corporate action on the part of SEQUENOM;

(3)   This Agreement has been duly executed and delivered by SEQUENOM and is a legal, valid, and binding obligation of Sequenom, enforceable against SEQUENOM in accordance with its terms;

(4)   SEQUENOM shall use, and shall ensure that its Affiliates use, the Licensed Patents only for, and within the scope of, the purposes stipulated in this Agreement, and shall include in all agreements with Sublicensees a covenant by each such Sublicensee to the same effect;

(5)   SEQUENOM agrees that it will not assert nor cause to be asserted against XENOMICS or its Affiliates any intellectual property right that is or might be infringed by reason of any activities of XENOMICS or its Affiliates that are carried out (i) in performance of XENOMICS' obligations under this Agreement or in exercise of XENOMICS' rights under this Agreement (provided, however, that the Limited Fetal Gender Determination Test excluded from the Exclusive License pursuant to Section 2.1 shall not be deemed to constitute a "XENOMICS' right under this Agreement" for purposes of this Section 7.2(5)) and (ii) in full compliance with the terms and conditions of this Agreement;

10

(6)   SEQUENOM shall comply with all applicable export and import control laws and regulations in its sale of Licensed Products or sublicensing of the Licensed Patents. In particular, SEQUENOM shall not export or re-export the Licensed Products in violation of such laws and regulations. SEQUENOM shall defend, indemnify and hold harmless XENOMICS from and against any violation of such laws or regulations by SEQUENOM or any of its Affiliates or its or their agents, officers, directors or employees; and

(7)   The execution, delivery, and performance of this Agreement by SEQUENOM do not and will not contravene any provision of the charter document or by-laws of SEQUENOM or any agreement or other obligation or the right of any third party.

## 8.   CONFIDENTIALITY

8.1.   Confidential Information. The nondisclosure and confidentiality provisions of this Section 8.1 supersede all prior nondisclosure and/or confidentiality agreements between the Parties and shall govern the exchange of information between the Parties in connection with the transactions contemplated under this Agreement, whether occurring before or after the Effective Date. As used herein, "Confidential Information" of a party means all Information a party has disclosed to the other during the Term that have been marked "Confidential" or "Proprietary" or, if orally presented, is indicated in writing reasonably timely to the disclosure to be confidential or proprietary. "Information" means information, results and data whatsoever, in any tangible or intangible form, including without limitation inventions, practices, methods, techniques, specifications, formulations, formulae, patents, copyrights, software, knowledge, know-how, skill, experience, trade secrets, ideas, concepts, processes, protocols, materials, samples, test data (including pharmacological, biological, chemical, biochemical, toxicological and clinical test data), analytical and quality control data, stability data, any other results of experimentation and testing, studies, procedures, drawings, and legal information or descriptions, and all intellectual property rights therein. Except to the extent expressly authorized by this Agreement or otherwise agreed in writing by the parties, (i) each Party shall keep confidential and shall not publish or otherwise disclose any Confidential Information of the other Party. A Party may use or disclose its own Confidential Information for any purpose.

8.2.   Exceptions. Notwithstanding Section 8.1 above, Confidential Information shall not include any Information that a Party can demonstrate by competent written evidence:

(8)   was already known to such Party, other than from a third party that is under an obligation of confidentiality to the other Party, at the time of disclosure by the other Party, or prior to its creation or discovery hereunder;

(9)   was generally available to the public or otherwise part of the public domain at the time of its disclosure to such Party;

Execution Version

(10)   became generally available to the public or otherwise part of the public domain after its disclosure and other than through any act or omission of such Party;

(11)   was disclosed to such Party, other than under an obligation of confidentiality to a third party, by a third party who had no obligation to the other Party not to disclose such information to others; or

(12)   was independently developed by such Party without using any Confidential Information of the other Party.

8.3.   Permitted Disclosure. Notwithstanding the limitations in this Section 8, each Party may disclose Confidential Information of the other Party to the extent such disclosure is reasonably necessary in the following instances, but solely for the limited purpose of such necessity:

(13)   prosecuting or defending litigation;

(14)   complying with applicable governmental laws or regulations, including without limitation, disclosure requirements promulgated by the NYSE, NASDAQ, U.S. Securities and Exchange Commission and equivalent government and regulatory bodies or valid court orders;

(15)   disclosure to directors, officers, employees, consultants, agents, Affiliates or collaborators, in each case solely in furtherance of this Agreement; provided, however, that such individuals or entities have agreed in writing to be bound by terms of confidentiality and non-use at least equivalent in scope to those set forth in this Section 8;

(16)   disclosure by XENOMICS in connection with regulatory filings; or

(17)   disclosure to investors and potential investors for the purpose of evaluating their investment or potential investment in such Party; provided, however, that such individuals or entities have agreed in writing to be bound by terms of confidentiality and non-use at least equivalent in scope to those set forth in this Section 8.

Notwithstanding the foregoing, in the event that a Party is required to make a disclosure of Confidential Information of the other Party pursuant to Sections 8.3(1) or 8.3(2) above, it will give prompt advance notice to the other Party of such disclosure and shall use its commercially reasonable efforts to assist the other Party in securing confidential treatment of such information.

8.4.   Publicity. Any press release distributed by SEQUENOM and/or XENOMICS in connection with this Agreement shall be approved in writing in advance by both parties, such approval not to be unreasonably delayed or withheld; provided, however, that if the Parties have previously approved a press release, the approved disclosure may be included or referenced in a subsequent release of a similar nature without prior approval of

12

both Parties, and provided, however, further that either Party may make such public disclosure as the Party reasonably determines to be desirable in connection with a disclosure permitted under Section 8.3, but only on the condition that the Party seeking such public disclosure first make a good faith effort to provide such disclosure to the other Party with sufficient time to review and comment on such disclosure before any such public disclosure is made.

8.5.   Terms and Conditions of the Agreement. The terms and conditions of this Agreement are deemed to be Confidential Information of each Party, to which the rights and obligations in Sections 8.1, 8.2, and 8.3 shall apply; provided, however, that each Party shall be free to disclose the terms and conditions of this Agreement to potential and actual investors and lenders; provided, however, in each case that such disclosures are subject to no less restrictive terms of confidentiality than as are set forth in this Agreement.

9.   **INDEMNIFICATION; DISCLAIMERS**

9.1.   Indemnification by SEQUENOM. SEQUENOM will indemnify, defend, and hold harmless XENOMICS, including XENOMICS' Affiliates, and their directors, officers, employees, and agents and their respective successors, heirs and assigns (collectively, "XENOMICS Indemnitees"), from and against any claim, suit, action, judgment, liability, damage, loss, cost, or expense (including reasonable attorneys' fees and expenses of litigation) asserted against or imposed upon any XENOMICS Indemnitee in connection with or arising out of any breach by SEQUENOM of any of SEQUENOM's representations, warranties or covenants in Section 7.2.

9.2.   Indemnification by XENOMICS. XENOMICS will indemnify, defend and hold harmless SEQUENOM, including SEQUENOM's Affiliates, and their directors, officers, employees, and agents and their respective successors, heirs and assigns (collectively, "SEQUENOM Indemnitees"), from and against any claim, suit, action, judgment, liability, damage, loss, cost or expense (including reasonable attorneys' fees and expenses of litigation) asserted against or imposed upon any SEQUENOM Indemnitee in connection with or arising out of any breach by XENOMICS of any XENOMICS' representations, warranties or covenants in Section 7.1.

9.3.   Indemnification Notice and Procedure. If any claim or liability is asserted against a Party entitled to indemnification under Section 9.1 or 9.2 (the "Indemnified Party") which would give rise to a claim under Section 9.1 or 9.2, the Indemnified Party will so notify the person giving the indemnity ("Indemnifying Party") within fifteen (15) days after receipt of such assertion of a claim or liability or such shorter period as may be necessary to meet any deadline for submitting or filing a response. The Indemnifying Party will have the right to defend a claim and control the defense, settlement and prosecution of any litigation. If the Indemnifying Party, within ten (10) days after notice of such claim or such shorter period as may be necessary to meet any deadline for submitting or filing a response, fails to undertake the defense of such claim, the Indemnified Party will (upon further notice to the Indemnifying Party) have the right to undertake the defense, compromise or settlement of such claim on behalf of and for the account and at the risk and expense of the Indemnifying Party. Anything in this Section 9.3 notwithstanding, the

13

Indemnifying Party will not, without the written consent of the Indemnified Party, settle or compromise any claim or consent to the entry of any judgment (a) which does not include as an unconditional term thereof the giving by the claimant to the Indemnified Party of a release from all liability in respect of such claim or (b) which may materially adversely affect the Indemnified Party, or under which the Indemnified Party would incur any obligation or liability, other than in either case by the payment of money as to which the Indemnifying Party has an indemnity obligation hereunder as to which Indemnifying Party has provided to the Indemnified Party reasonable assurances for the Indemnifying Party's full and prompt satisfaction of the same. The Parties agree to cooperate fully as necessary in the defense of such matters. Should the Indemnified Party fail to notify the Indemnifying Party in the time required above, the indemnity with respect to the subject matter of the required notice will be limited to the damages that would have resulted absent the Indemnified Party's failure to notify the Indemnifying Party in the time required above after taking into account such actions as could have been taken by the Indemnifying Party had it received timely notice from the Indemnified Party.

    9.4.    <u>Warranty Disclaimer/Liability</u>. EXCEPT AS EXPRESSLY SET FORTH IN SECTION 7, THE PARTIES DISCLAIM AND MAKE NO EXPRESS OR IMPLIED WARRANTY, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, IN CONNECTION WITH THIS AGREEMENT OR WITH RESPECT TO ANY OF THE LICENSED TECHNOLOGY OR ANY LICENSED PRODUCTS.

IN NO EVENT SHALL EITHER PARTY:  (I) BE LIABLE TO THE OTHER PARTY FOR AN AMOUNT EXCEEDING THE AMOUNT PAID BY SEQUENOM TO XENOMICS HEREUNDER, WITH THE EXCEPTION OF A MATERIAL BREACH BY XENOMICS OF SECTION 7.1(6) OR SECTION 7.1(7), IN WHICH CASE XENOMICS' LIABILITY SHALL NOT EXCEED THE AGGREGATE AMOUNT OF $5,000,000, OR (II) BE LIABLE TO THE OTHER PARTY FOR ANY TYPE OF INCIDENTAL, PUNITIVE, INDIRECT, OR CONSEQUENTIAL DAMAGES, INCLUDING LOSS OF REVENUE OR PROFIT, HOWEVER CAUSED, INCLUDING, WITHOUT LIMITATION, ANY USE OR INABILITY TO USE THE LICENSED PATENTS BYSEQUENOM, ITS CUSTOMERS, SUBCONTRACTORS OR SUBLICENSEES, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, WHETHER UNDER THEORIES OF CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR OTHERWISE. The Parties acknowledge that the fees and other consideration reflect the allocation of risk set forth in this Agreement and that the Parties would not enter into this Agreement without these limitations on their respective liability.

## 10.  TERM AND TERMINATION

    10.1.    <u>Term of License to SEQUENOM</u>. Unless terminated earlier as provided in Sections 10.2 or 10.3, this Agreement, including the license granted to SEQUENOM hereunder, will enter into full force and effect on the Effective Date and expire upon the expiration of the last to expire of any Valid Claim within the Licensed Patents (the "Term"), on a country-by-country basis.

10.2.    Termination for Breach.  Either Party has the right to terminate this Agreement, by written notice to the other Party, in the event that such other Party is in material breach of any of its representations, warranties or covenants in Sections 7.1 or 7.2 or any other material obligation under this Agreement and the breaching Party has not cured such breach within thirty (30) days after written breach notice from the non-breaching Party.

10.3.    Termination by Sequenom.  SEQUENOM has the right to terminate this Agreement for any reason, in SEQUENOM's sole and absolute discretion, upon sixty (60) days prior written notice to XENOMICS.

10.4. Effect of Termination.

(1)    Upon termination of this Agreement for any reason, nothing herein will be construed to release either Party from any obligation that matured prior to the effective date of such termination.

(2)    Upon termination of this Agreement for any reason, SEQUENOM shall immediately cease all sales and marketing of Licensed Products and terminate all existing sublicenses in accordance with the terms thereof.

(3)    Upon termination of this Agreement for any reason, all payments owed to XENOMICS as of the date of termination shall be due no later than sixty (60) days after the date of termination.

(4)    Upon termination of this Agreement for any reason, each Party shall promptly return, if requested by the other Party, all of the other Party's materials and documents, and all Confidential Information of the other Party.

(5)    Sections 1, 3, 4, 5, 6.1, 8, 9, 10.4, 11 and 12 shall survive expiration or termination of this Agreement for any reason.

## 11.   DISPUTE RESOLUTION

11.1. Negotiation.  The parties agree to consult and negotiate in good faith to try to resolve any dispute, controversy or claim that arises out of or relates to this Agreement.  In the event of any controversy or claim arising out of, relating to, or in connection with any other provision of this Agreement, or the rights or obligations of the parties hereunder, the parties shall try to settle their differences amicably between themselves by referring the disputed matter to the Chief Executive Officer of XENOMICS and the Chief Executive Officer of SEQUENOM for discussion and resolution.  Either Party may initiate such informal dispute resolution by sending written notice of the dispute to the other Party, and within fifteen (15) days of such notice the Chief Executive Officer of XENOMICS and the Chief Executive Officer of SEQUENOM shall meet for attempted resolution by good faith negotiations.

11.2. Arbitration.  If such Chief Executive Officers are unable to resolve such dispute within sixty (60) days of initiating such negotiations, then, upon the written request of either Party, the dispute shall be finally settled (i) if by the request of SEQUENOM, by arbitration to

be held in New York, New York, USA, and (ii) if by the request of XENOMICS, by arbitration to be held in San Diego, California, in either case in accordance with the Comprehensive Arbitration Rules and Procedures of JAMS, before a panel of three arbitrators selected as follows: one arbitrator shall be selected by XENOMICS, one arbitrator shall be selected by SEQUENOM, and a third arbitrator shall be selected by the two arbitrators selected by the Parties. The parties shall be entitled to full discovery in such arbitration. The arbitration panel shall be permitted to award a Party its reasonable attorneys' fees and other reasonable legal fees and expenses incurred in connection with the arbitration proceedings. The decision of the arbitration panel shall be final and binding upon the parties and may be enforced in any court of competent jurisdiction.

## 12.   GENERAL

12.1. Assignment. This Agreement will be binding upon and will inure to the benefit of each Party and each Party's respective transferees, successors and assigns; provided, however, that neither Party will have the right to assign or delegate this Agreement or its rights and obligations hereunder to any other Person without the prior written consent of the other Party, except that, no such consent will be required in the event of an assignment or delegation to an Affiliate or in the event of the assigning or delegating Party's merger, acquisition, consolidation, change of control or sale or other transfer of such Party's entire business or that part of such Party's business to which this Agreement relates, provided, in all such cases, that any such assignee or delegatee has agreed in writing to be bound by this Agreement. Any purported assignment or delegation in violation of the provisions of this paragraph will be null and void.

12.2. Entire Agreement/Amendments. This Agreement constitutes the sole, final and entire agreement between the Parties relating to the subject matter hereof, and all prior agreements or understandings are superseded hereby. This Agreement may only be amended by a writing signed by both Parties.

12.3. Notices. All notices, reports, requests, acceptances, and other communications required or permitted under this Agreement will be in writing and will reference this Agreement. They will be deemed delivered: (i) when delivered in person, (ii) when sent by acknowledged facsimile or acknowledged e-mail, (iii) two (2) business days after having been sent by commercial overnight courier with written verification of receipt, or (iv) five (5) business days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or upon actual receipt thereof, whichever occurs first. An acknowledged e-mail communication or fax will be deemed to be a communication in writing. All communication will be sent to the receiving Party as follows or to such address that the receiving Party may designate pursuant to this Section 12.3.

If to SEQUENOM:     Sequenom, Inc.
                    Attn: General Counsel
                    3595 John Hopkins Court
                    San Diego, CA 92121
                    Fax: (858) 202-9020

16

Execution Version

If to XENOMICS:      Xenomics, Inc.
                     Attn: Gary Anthony
                     One Deer Park Drive, Suite F
                     Monmouth Junction, NJ 08852
                     Fax: (732) 438-8299

12.4. Governing Law.  This Agreement shall be construed and enforced solely and exclusively in accordance with the laws of the State of Delaware without giving effect to any law that would result in the application of the laws of any other jurisdiction.

12.5. Injunctive Relief.  A breach of any of the promises or agreements contained in this Agreement may result in irreparable and continuing damage to a Party for which there may be no adequate remedy at law, and each Party is therefore entitled to seek injunctive relief as well as such other and further equitable relief as may be appropriate.  The obligations provided under Section 8 of this Agreement are acknowledged as necessary and reasonable in order to protect each Party and its business, and the parties expressly agree that monetary damages would be inadequate to compensate either Party for the breach thereof.  Accordingly, each Party agrees and acknowledges that any such violation or threatened violation will cause irreparable injury to the other Party and that, in addition to any other remedies that may be available, in law, in equity or otherwise, each Party shall be entitled to obtain injunctive relief against the breach or threatened breach by the other party of Section 8, without the necessity of proving actual damages

12.6. Bankruptcy.  This Agreement, including the Exclusive License and all other rights and licenses granted under or pursuant to this Agreement by XENOMICS to SEQUENOM, are and shall be deemed for all purposes of §365(n) of Title 11 of the United States Code ("Title 11") to be licenses of rights to "intellectual property" as defined in Title 11 that are executory in nature until terminated.  If this Agreement is rejected in any bankruptcy proceeding, then in addition to other rights hereunder, the Parties agree that SEQUENOM is and shall be entitled to all rights under Section 365(n) of the Bankruptcy Code, including the full and ongoing exercise of the Exclusive License and use of the embodiment of all intellectual property in, and any improvement of, the License Patents created after the Effective Date.

12.7. Headings.  Headings included herein are for convenience only, and will not be used to construe this Agreement.

12.8. Independent Contractors.  Each Party will be, and will be deemed to be, an independent contractor and not an agent, partner, joint venturer or employee of the other Party.  Neither Party will have authority to make any statements, representations, or commitments of any kind, or to take any action which will be binding on the other Party, except as may be explicitly provided for herein or authorized in writing.

12.9. Severability.  If any provision of this Agreement will be found by a court of competent jurisdiction to be void, invalid or unenforceable, the same will either be reformed to comply with applicable law or stricken if not so conformable, so as not to affect the validity or enforceability of this Agreement.

Execution Version

12.10. No Waiver. Failure of either Party to enforce a right under this Agreement will not act as a waiver of that right or the ability to later assert that right relative to the particular situation involved or to terminate this Agreement arising out of any subsequent default or breach.

12.11. Counterparts. This Agreement may be executed in any number of counterparts, each of which will constitute an original document, but all of which will constitute the same agreement.

[Signature Page Follows]

18

Execution Version

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the date first set forth above.

Xenomics, Inc.

Sequenom, Inc.

By:_____

By:_____

Gary Anthony
Vice President and Controller

Clarke W. Neumann
VP & General Counsel

By:_____

Paul Hawran
Chief Financial Officer

Execution Version

Exhibit A

**Licensed Patents**

| Application Number (Priority Application Number) | Patent Number | Filing Date | Title |
|---|---|---|---|
| 09/230,704 (PCT/US98/10965) | US 6,251,638 | Feb. 4, 2000 | Methods for detection of nucleic acid sequences in urine |
| 10/992,639 Reissue of 09/634,732 (09/230,704) (09/609,162) (PCT/US98/10965) | US RE39,920 | Nov. 19, 2004 | Methods for detection of nucleic acid sequences in urine |
| EP 98924998.2 (PCT/US98/10965) | EP 0920539 (B1, B9) | May 29, 1998 | Methods for detection of nucleic acid sequences in urine |

Execution Version

Exhibit B

Warrant

EXHIBIT C

Print Page | Close Window

<< Back

## Sequenom Announces Results of Screening Studies for Down Syndrome and Updates Development of Noninvasive Prenatal Diagnostics at Analyst and Investor Briefing

SAN DIEGO--(BUSINESS WIRE)--June 4, 2008--Sequenom, Inc. (NASDAQ:SQNM), a leading provider of genetic-analysis solutions, announced positive results from screening studies using the Company's noninvasive circulating cell-free fetal (ccff) nucleic acid SEQureDx(TM) Technology, which enables the detection of fetal aneuploidy, including Down syndrome from maternal blood. At its analyst-and-investor briefing "The Future of Noninvasive Prenatal Diagnostics" held at the International Society of Prenatal Diagnostics (ISPD) conference in Vancouver, Canada, executives were joined by a panel of leading scientists and clinicians to discuss study results and updates in the development of noninvasive prenatal diagnostics.

The Company reported that in blinded studies performed at Sequenom involving approximately 200 clinical samples collected both prospectively and retrospectively, its proprietary test for Down syndrome correctly identified 100% of all Down syndrome samples (i.e. sensitivity or detection rate), without any false-positive outcomes (i.e. specificity). Population coverage for the T21 test improved to at least 93% of the U.S. population. With currently available serum-testing options having detection rates between 70% to 90% and false-positive rates as high as 5%, SEQureDx Technology shows promise for significant performance advantages over the current paradigms for prenatal screening. The Company expects to continue its development activities through the end of 2008, at which time the Company will initiate transfer of the technology to laboratory partners. The Company plans to initiate a multi-site validation study consisting of several thousand samples in the fourth quarter this year and launch its Down syndrome test as a Laboratory Developed Test (LDT) in the U.S. in the first half 2009.

"We are very pleased to be reporting substantial progress toward commercializing an important test to screen for Down syndrome that can be administered as early as late in the first trimester through a simple blood draw from the mother," said Harry Stylli, Ph.D., Sequenom's President and Chief Executive Officer. "Data from our blinded screening study for the detection of fetal aneuploidy indicate that the current version of our test has identified all Down syndrome samples without any false-positive outcomes. Also our coverage has improved to at least 93% of the U.S. population. Although these results require further validation in larger studies, such results using SEQureDxTM Technology can potentially transform current clinical practice for Down syndrome-risk assessment."

The studies conducted both prospectively and retrospectively, involved approximately 200 samples in both normal and high-risk patients. The blinded-prospective study involved 160 samples comprising 130 low-risk and 50 high-risk samples. The test correctly identified three Down syndrome samples without any false-positive outcomes. Of the 21 blinded samples analyzed retrospectively, the test correctly identified seven Down syndrome samples while also indicating no false-positive results.

"A direct, noninvasive genetic assessment of fetal Down syndrome will result in far-better screening accuracy and would dramatically reduce the number of unnecessary, invasive diagnostic procedures that women undergo in current maternal serum-screening protocols. Improved detection rates, as reported by Sequenom in its assay optimization studies, exceed those with currently available screening models," said Allan T. Bombard, M.D., a reproductive geneticist with more than two decades of experience in the field of prenatal screening and diagnosis. (Dr. Bombard serves as a Chief Medical Director at Sharp Mary Birch Hospital and is the Principal Investigator of the study.) "Moreover, having minimum false-positive results will significantly reduce the number of unnecessary confirmatory diagnostic tests, as well as the anxiety and complications associated with invasive procedures."

Currently available tests conducted during the first or second trimester of pregnancy use epigenetic markers associated with the Down syndrome phenotype that are characterized as "surrogate" markers as they are not directly related to the extra Number 21 chromosome. Different combinations of markers, measured at different times in pregnancy, constitute the multiple-marker approach to screening. These tests have detection rates of 70% to 90% with approximately a 5% false-positive rate, while also having inconsistent population coverage or ethnicity rates. The SEQureDx test uses a maternal

blood sample drawn as early as the first trimester and identifies directly the extra Number 21 chromosome. Invasive procedures such as amniocentesis or chorionic villus sampling (CVS) carry risk of miscarriage and other risks to mother and fetus.

"Current screening methods, using multiple 'surrogate' markers, are very good, but are unlikely to reach diagnostic potential," said Jacob Canick, Ph.D., Professor of Pathology and Laboratory Medicine at Brown University Medical School. "In contrast, I am optimistic that tests using multiple-fetal RNA and DNA markers can be developed not only for Down syndrome, but for all clinically important aneuploidies, and it is reasonable to expect that such direct, noninvasive diagnostics could be done in the first trimester of pregnancy."

Sequenom's analyst-and-investor-briefing event speakers included Alan Bombard, M.D., Chief Medical Officer at Sharp Mary Birch Hospital, who discussed current clinical practices for Down syndrome screening and diagnosis; Jacob Canick, Ph.D., Professor of Pathology and Laboratory Medicine at Brown University Medical School, who discussed methods for screening pregnancies for Down syndrome; Professor Dennis Lo, consultant to Sequenom and a leading researcher in prenatal diagnostics, who discussed the future of prenatal diagnosis; and Sequenom's Senior Vice President of Research and Development Elizabeth Dragon, Ph.D., who reviewed progress with Sequenom's SEQureDx Technology in developing a test for Down syndrome. A webcast of the event is available on the Company Web site at www.sequenom.com.

Sequenom's Proprietary Noninvasive Prenatal Diagnostics

Sequenom's commercial opportunities in prenatal diagnostics are built upon its SEQureDx technologies and are enabled by the pioneering inventions and associated intellectual property rights that it has exclusively licensed from Isis Innovation Ltd., the technology transfer company of the University of Oxford, as well as The Chinese University of Hong Kong. Sequenom's portfolio of noninvasive prenatal diagnostic patent rights and patent applications is platform-independent, includes genetic-analysis methods using circulating cell-free fetal nucleic acids from maternal serum, plasma or whole blood, and also includes a portfolio of methylation and nucleic-acid markers. Sequenom holds exclusive rights in territories including the United States, Europe, Australia, Canada, Japan and Hong Kong. Sequenom is actively expanding its intellectual property position with new technology and new territories. Because Sequenom's license rights are platform-independent, the rights provide exclusivity (with the narrow exception in Europe for RT-PCR-based Rhesus D tests) for development and commercialization of noninvasive prenatal screens and tests on any platform and are not limited to the Company's MassARRAY platform.

About SEQureDx Technology

Sequenom's SEQureDx Technology is a novel approach to genetic screening. Unlike current standards of harvesting placental tissue cells as is required for chorionic villus, or entering the uterus to sample the amniotic fluid surrounding the baby as is performed with amniocentesis, SEQureDx Technology extracts Fetal Nucleic Acid material safely and comfortably from a simple blood specimen collected from the mother to determine the genetic status of the fetus. This breakthrough suggests that effective screening may be accomplished in the future without the risks associated with disturbing the amniotic fluid that surrounds the baby in the uterus. In December 2007, the Company, through its laboratory partner, introduced a laboratory-developed RhD incompatibility test using RT-PCR in the United States. In February 2008, Sequenom announced progress with its noninvasive Trisomy 21 test based on multiple RNA fetal markers, including the PLAC4 gene as previously published by Dr. Dennis Lo, Chinese Hong Kong University. In these preliminary studies, data from more than 100 clinical plasma specimens of various ethnicities indicated that the development-stage Trisomy 21 test was approaching 85% (+/- 5%) ethnic coverage, more than 95% sensitivity and close to 99% specificity.

About Down Syndrome

Down syndrome is a chromosomal abnormality characterized by the presence of an extra copy of genetic material on the 21st chromosome, either in whole (Trisomy 21) or in part (such as due to translocations). The effects of the extra copy vary greatly among people, depending on the extent of the extra copy, genetic history and pure chance. In 2007, the American College of Obstetricians and Gynecologists (ACOG) endorsed guidelines that offer risk assessment to all pregnancies for fetal chromosomal abnormalities, including Down syndrome. The ACOG recommendation includes screening before the

20th week of pregnancy using a less-invasive screening option that includes ultrasound in conjunction with the measurement of certain blood hormones. It is estimated that approximately 70%, or 2.8 million, women undergo Down syndrome screening in the United States each year.

About Sequenom

Sequenom is committed to providing the best genetic-analysis products for research and the molecular-diagnostic markets. The Company makes available superior solutions for genomic science in biomedical research, livestock and agricultural applications and molecular medicine, as well as for various diagnostic markets, including noninvasive prenatal testing, oncology and infectious diseases. Sequenom's proprietary MassARRAY system delivers reliable and specific data from complex biological samples and from genetic-target materials available only in trace amounts.

Sequenom(R), MassARRAY(R) and SEQureDx(TM) are trademarks of Sequenom, Inc.

Except for the historical information contained herein, the matters set forth in this press release, including statements regarding the future performance, impact on healthcare, expectations, plans, and timelines for development, screening studies, validation studies, partnering and technology transfer, and commercialization of the Company's SEQureDx Technology for detection of fetal aneuploidy including Down syndrome, are forward-looking statements within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995. These forward-looking statements are subject to risks and uncertainties that may cause actual results to differ materially, including the risks and uncertainties associated with demand for and market acceptance of Sequenom's products, services, and technologies, new technology and product development and commercialization, reliance upon the collaborative efforts of other parties, research and development progress, competition, government regulation particularly with respect to diagnostic products and laboratory developed tests, obtaining or maintaining regulatory approvals, and other risks detailed from time to time in the Company's SEC reports, including the Company's Annual Report on Form 10-K for the year ended December 31, 2007 and subsequent periodic reports. These forward-looking statements are based on current information that is likely to change and speak only as of the date hereof. You are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date of this press release. All forward-looking statements are qualified in their entirety by this cautionary statement, and the Company undertakes no obligation to revise or update any forward-looking statement to reflect events or circumstances after the issuance of this press release.

```
CONTACT: Company Contact
         Sequenom, Inc.
         Paul R. Bauran, Chief Financial Officer, 858-202-9000
         or
         Investor Relations Contact
         Lippert/Heilshorn & Associates
         Jody Cain, 310-691-7100
         jcain@lhai.com

SOURCE: Sequenom, Inc.
```

EXHIBIT D

Print Page | Close Window

### Sequenom Launches Public Offering of Common Stock

SAN DIEGO--(BUSINESS WIRE)--June 23, 2008--Sequenom, Inc. (NASDAQ:SQNM) today announced that it has filed a preliminary prospectus supplement to an automatically effective shelf registration statement with the Securities and Exchange Commission relating to a proposed public offering of 5,500,000 shares of its common stock. In connection with this offering, Sequenom plans to grant to the underwriters a 30-day option to purchase up to an additional 825,000 shares of common stock. All of the shares are being offered by Sequenom. Sequenom expects the net proceeds from the offering to be used for the development of diagnostic tests for use on its MassARRAY(R) system and other platforms, and for general corporate purposes.

Lehman Brothers Inc. and UBS Investment Bank are acting as joint book-running managers in this offering. The co-managers for the offering are Leerink Swann & Co., Inc., Lazard Capital Markets LLC, Oppenheimer & Co., Inc. and Rodman & Renshow, LLC.

This press release shall not constitute an offer to sell or the solicitation of an offer to buy these securities, nor shall there be any sale of these securities, in any jurisdiction in which such offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of any such jurisdiction. The offering of these securities may be made only by means of the prospectus supplement, related prospectus and any supplemental information relating to the offering. Copies of the preliminary prospectus supplement and accompanying prospectus may be obtained from Lehman Brothers Inc. by e-mail at qiana.smith@broadridge.com, by phone at 888.603.5847, by fax at 631.254.7140, or by mail at Lehman Brothers Inc., c/o Broadridge Integrated Distribution Services, 1155 Long Island Avenue, Edgewood, NY 11717, or from UBS Securities LLC, 299 Park Avenue, New York, NY 10171 Attn: Prospectus Department, or by telephone toll free at 888-827-7275, extension 3884.

#### Forward-Looking Statements

This press release contains forward-looking statements, including statements relating to Sequenom's expectations regarding the completion and size of the proposed public offering and its expected use of proceeds from the offering. These statements are subject to significant risks and uncertainties, actual results could differ materially from those projected and Sequenom cautions investors not to place undue reliance on the forward-looking statements contained in this release. These risks and uncertainties include, without limitation, risks and uncertainties related to market conditions and satisfaction of customary closing conditions related to the public offering. There can be no assurance that Sequenom will be able to complete the public offering on the anticipated terms, or at all. Additional risks and uncertainties relating to Sequenom and its business are detailed from time to time in Sequenom's reports filed with the Securities and Exchange Commission and in the prospectus supplement related to the proposed offering. Sequenom undertakes no duty or obligation to update any forward-looking statements contained in this release as a result of new information, future events or changes in Sequenom's expectations.

```
CONTACT: Sequenom, Inc.
         Paul V. Hawran, 858-202-9000
         Chief Financial Officer
         or
         Investor Relations Contact
         Lippert/Heilshorn & Associates
         Jody Cain, 310-691-7100
         jcain@lhai.com

SOURCE: Sequenom, Inc.
```

EXHIBIT E

Print Page | Close Window

## Sequenom Announces Additional, Positive Results for Down Syndrome Test at Analyst Briefing

Management Joined by Leading Scientists and Clinicians to Discuss Study Results and Other Business Updates

SAN DIEGO & NEW YORK--(BUSINESS WIRE)--Sept. 23, 2008--Sequenom, Inc. (NASDAQ:SQNM), a leading provider of genetic-analysis and molecular diagnostic solutions, announced additional, positive results from screening studies using the Company's noninvasive circulating cell-free fetal (ccff) nucleic acid SEQureDx(TM) Technology, which enables the detection of fetal aneuploidy, including Down syndrome from maternal blood, at its Analyst Briefing in New York City. Among the data presented, Sequenom's test demonstrated complete concordance with clinical results (no false positives and no false negatives) in both first and second trimester samples (over 200 samples announced today and in excess of 400 prospective samples to-date). Sequenom executives were joined by a panel of leading scientists and clinicians to discuss these study results and updates in the development of noninvasive prenatal diagnostics.

"These data expand upon the data we announced in June and underscore the potential for our SEQureDx Technology to transform current clinical practice for prenatal diagnostics as a primary screening tool for Trisomy 21. Furthermore, these results support the potential for our test to be used in the first trimester," said Harry Stylli, Ph.D., Sequenom's President and Chief Executive Officer. "In addition, our announcement earlier today regarding our acquisition of the Center for Molecular Medicine, a CLIA-certified molecular diagnostics laboratory, and our partnership with Spectrum Health and the Van Andel Research Institute, provides us with important infrastructure and commercialization control. We are delighted with our progress in bringing to market an important, noninvasive screening test for Down syndrome, as well as a broader menu of molecular diagnostic tests. These results are very promising, and we look forward to continuing the clinical development and validation progress to launch in the first half of 2009."

Elizabeth Dragon, Ph.D., Senior Vice President of Research and Development at Sequenom, presented data from blinded studies performed at Sequenom involving 219 new clinical samples collected prospectively, showing that its proprietary test for Down syndrome correctly identified 100% of all Down syndrome samples (i.e. sensitivity or detection rate), without any false-positive outcomes (i.e. specificity). The SEQureDx prototype test also demonstrated its ability to correctly identify a Down syndrome positive sample in the first trimester, confirmed by chorionic villus sampling (CVS), a current testing standard that requires the harvesting of placental tissue cells.

Sequenom indicated that with the addition of new SNPs in PLAC4 and a recently discovered gene, the SEQureDx Trisomy 21 test should increase its coverage from 93% to greater than 95% in the US population. The Company has also identified novel markers for Trisomy 18 that have passed its initial selection criteria, and other chromosomes, and intends to develop these markers into new tests.

The Company expects to continue its current development activities through the end of 2008, at which time the Company will initiate a multi-site 3,000 to 5,000-sample laboratory developed test (LDT) validation study, which is expected to be completed and submitted for publication at the time of the anticipated commercial launch in June 2009. To facilitate the LDT validation study, Sequenom also indicated that the company will be collaborating with new clinical partners who perform in excess of 12,000 amniocenteses and 3,000 CVS per year. In addition, Sequenom announced sponsorship of the RNA Noninvasive Aneuploidies ("RNA") study, a landmark, multi-center, prospective study involving up to 10,000 samples from first and second trimester pregnancies using the SEQureDx technology, managed and analyzed by an independent third-party.

During the Analyst Briefing, management also highlighted key upcoming milestones for the prenatal diagnostics business, including:

- -- Confirm 10-week or earlier gestational age testing

- -- Evaluate integration of T18 (Edward's syndrome) assay into the first generation test

- -- Initiate T21 LDT clinical validation study evaluating 3,000 to

5,000 samples

-- Complete T21 testing of up to 800 additional high prevalence
   specimens by year-end 2008

-- Initiate "RNA" multi-center study involving 10,000 high
   prevalence patient samples

-- Submission of key data for publication

-- Commercial launch of T21 test in first half of 2009

Sequenom's analyst briefing included the following speakers and topics:

-- Harry Stylli, Ph.D., Chief Executive Officer, Sequenom
   Business Overview and Update

-- Charles R. Cantor, Ph.D., Chief Scientific Officer, New
   applications of the Sequenom Platform

-- Yury Khudyakov, Ph.D., Chief, Molecular Epidemiology and
   Bioinformatics Laboratory, Division of Viral Hepatitis,
   Centers for Disease Control and Prevention, Novel Molecular
   Technologies for Public Health

-- Betty Dragon, Ph.D., Senior Vice President, R&D, Noninvasive
   Prenatal Detection of Genetic Abnormalities Using SEQure
   Dx(TM) Technology

-- Daniel H. Farkas, PhD, HCLD, FACB, Executive Director, Center
   for Molecular Medicine, Real-world Genetic Testing:
   Translating Science Into Routine Clinical Tests

-- Gary S. Riordan, Vice President, Regulatory Affairs and
   Quality, FDA Regulatory Environment

-- Jacob A. Canick, Ph.D., Professor of Pathology and Laboratory
   Medicine, Brown University Medical School, Design And
   Implementation of a Landmark, Multicenter, Prospective
   Clinical Study To Validate The Safe And Accurate Detection Of
   Down Syndrome Using SEQure Dx(TM) Technology

-- Allan T. Bombard, M.D., FACOG, FACS, FACMG, reproductive
   geneticist, Chief Medical Officer, Sharp Mary Birch Hospital,
   Are We Facing a Revolution in Noninvasive Prenatal Genetic
   Diagnostics?

A recording of the webcast of the event will be available on the Company Web site at www.sequenom.com until October 7, 2008.

Sequenom's Proprietary Noninvasive Prenatal Diagnostics

Sequenom's commercial opportunities in prenatal diagnostics are built upon its SEQureDx technologies and are enabled by the pioneering inventions and associated intellectual property rights that it has exclusively licensed from Isis Innovation Ltd., the technology transfer company of the University of Oxford, as well as The Chinese University of Hong Kong. Sequenom's portfolio of noninvasive prenatal diagnostic patent rights and patent applications is platform-independent, includes genetic-analysis methods using circulating cell-free fetal nucleic acids from maternal serum, plasma or whole blood, and also includes a portfolio of methylation and nucleic-acid markers. Sequenom holds exclusive rights in territories including the United States, Europe, Australia, Canada, Japan and Hong Kong. Sequenom is actively expanding its intellectual property position with new technology and new territories. Because Sequenom's license rights are platform-independent, the rights provide exclusivity (with the narrow exception in Europe for RT-PCR-based Rhesus D tests) for development and commercialization of noninvasive prenatal screens and tests on any platform and are not limited to the Company's MassARRAY platform.

About SEQureDx Technology

Sequenom's SEQureDx Technology is a novel approach to genetic screening. Unlike current standards of harvesting placental tissue cells as is required for chorionic villus, or entering the uterus to sample the amniotic fluid surrounding the baby as is performed with amniocentesis, SEQureDx Technology extracts Fetal Nucleic Acid material safely and comfortably from a simple blood specimen collected from the mother to determine the genetic status of the fetus. This breakthrough suggests that effective screening may be accomplished in the future without the risks associated with disturbing the amniotic fluid that surrounds the baby in the uterus. In December 2007, the Company, through its laboratory partner, introduced a laboratory-developed RHD genotyping test using RT-PCR in the United States. In February 2008, Sequenom announced progress with its noninvasive Trisomy 21 test based on multiple RNA fetal markers, including the PLAC4 gene as previously published by Dr. Dennis Lo, Chinese Hong Kong University.

About Down Syndrome

Down syndrome is a chromosomal abnormality characterized by the presence of an extra copy of genetic material on the 21st chromosome, either in whole (Trisomy 21) or in part (such as due to translocations). The effects of the extra copy vary greatly among people, depending on the extent of the extra copy, genetic history and pure chance. In 2007, the American College of Obstetricians and Gynecologists (ACOG) endorsed guidelines that offer risk assessment to all pregnancies for fetal chromosomal abnormalities, including Down syndrome. The ACOG recommendation includes screening before the 20th week of pregnancy using a less-invasive screening option that includes ultrasound in conjunction with the measurement of certain blood hormones. It is estimated that approximately 70%, or 2.8 million, women undergo Down syndrome screening in the United States each year.

About Sequenom

Sequenom is committed to providing the best genetic-analysis products for research and the molecular-diagnostic markets. The Company makes available superior solutions for genomic science in biomedical research, livestock and agricultural applications and molecular medicine, as well as for various diagnostic markets, including noninvasive prenatal testing, oncology and infectious diseases. Sequenom's proprietary MassARRAY system delivers reliable and specific data from complex biological samples and from genetic-target materials available only in trace amounts.

Sequenom(R), MassARRAY(R) and SEQureDx(TM) are trademarks of Sequenom, Inc.

Except for the historical information contained herein, the matters set forth in this press release, including statements regarding the potential of the Company's SEQureDx Technology, the continuing development and potential of the Company's screening test for Down syndrome and other molecular diagnostic tests, the Company's acquisition of the Center for Molecular Medicine, the Company's partnership with Spectrum Health and the Van Andel Research Institute, the Company's future collaborations to conduct additional clinical testing, and the Company's sponsorship of the RNA Noninvasive Aneuploidies study are forward-looking statements within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995. These forward-looking statements are subject to risks and uncertainties that may cause actual results to differ materially, including the risks and uncertainties associated with demand for and market acceptance of Sequenom's products, services, and technologies, new technology and product development and commercialization, reliance upon the collaborative efforts of other parties, research and development progress, competition, government regulation particularly with respect to diagnostic products and laboratory developed tests, obtaining or maintaining regulatory approvals, and other risks detailed from time to time in the Company's SEC reports, including the Company's Annual Report on Form 10-K for the year ended December 31, 2007 and subsequent periodic reports. These forward-looking statements are based on current information that is likely to change and speak only as of the date hereof. You are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date of this press release. All forward-looking statements are qualified in their entirety by this cautionary statement, and the Company undertakes no obligation to revise or update any forward-looking statement to reflect events or circumstances after the issuance of this press release.

CONTACT: Sequenom, Inc.
Paul W. Hawran

Chief Financial Officer
858-202-9000
or
Investor Relations Contact
Lippert/Heilshorn & Associates
Jody Cain (jcain@lhai.com)
Kevin Mc Cabe (kmccabe@lhai.com)
310-691-7100

SOURCE: Sequenom, Inc.

EXHIBIT F

Print Page | Close Window

### Next-Generation Noninvasive Diagnostic Technology Shown to Accurately Detect Fetal Down Syndrome in First Trimester of Pregnancy

SAN DIEGO--(BUSINESS WIRE)--Dec. 1, 2008--Sequenom, Inc. (NASDAQ:SQNM) announced new data from a collaborative project with The Chinese University of Hong Kong, published this week in the Early Edition of the Proceedings of the National Academy of Sciences, that demonstrate its innovative, next-generation, noninvasive prenatal diagnostic technology accurately quantified maternal plasma DNA sequences for fetal Trisomy 21, or Down syndrome, based on samples taken from women in the first and second trimesters of pregnancy. These data are the first to suggest that this future approach, based on massively parallel genomic DNA sequencing, can be effective in women who had not previously undergone invasive procedures.

This study used massively parallel genomic sequencing to quantify maternal plasma DNA sequences for the noninvasive prenatal detection of Down syndrome, assessing samples from 28 women in the first and second trimesters of pregnancy. All 14 Down syndrome fetuses and normal fetuses were correctly identified at these early stages.

"Current invasive methods for diagnosing Down syndrome in pregnancy have documented risks associated with such procedures. Our new study using massively parallel genomic DNA sequencing represents a 'next-generation' technology for noninvasive, safe testing of Down syndrome. This is the first study to show that this approach can be used for the detection of Down syndrome in both the first and second trimesters, based on a 'rigorously controlled clinical cohort in which the pregnant women with fetuses affected by Trisomy 21 and those with normal fetuses were matched in gestational age, and in which most of the studied subjects had not previously undergone an invasive procedure. The latter point is important as it shows that the method would truly work in the noninvasive prenatal diagnostic scenario. This study also employs a novel data analysis algorithm which has achieved an unprecedented clear separation of the Trisomy and normal samples," stated Dennis Lo, M.D., Ph.D., co-author of the study, and Li Ka Shing, Professor of Medicine at The Chinese University of Hong Kong. "While this new approach is several years away as a commercially viable test, we believe that massively parallel genomic sequencing of DNA in maternal plasma may offer a complementary approach to the RNA SNP allelic ratio approach that we reported last year for Trisomy 21 detection. The two approaches have performance and cost profiles which would potentially be synergistic to one another."

Sequenom licensed the exclusive rights to the massively parallel genomic DNA sequencing technology featured in this study from The Chinese University of Hong Kong in September 2008.

"Screening tests currently available for early detection of Down syndrome and other chromosomal disorders are associated with a relatively high rate of inaccuracy, which can result in an overlooked abnormality or, in the case of false positive results, unnecessary invasive and risky procedures," stated Harry Stylli, Ph.D., President and Chief Executive Officer of Sequenom. "Systems to support DNA sequencing like massively parallel genomic sequencing or shotgun sequencing are currently limited to the academic setting due to scalability limitations and high cost, therefore practical applications are several years from commercialization. We find the data reported by Dr. Lo and associates to be very compelling and, while we continue to evaluate other promising approaches, Sequenom licensed this technology several months ago because we believe massively parallel genomic sequencing is a promising approach to prenatal diagnostics that may offer a future extension to our SEQureDx(TM) prenatal diagnostics franchise. Even though this technology is years away from the clinic, we expect that our current RNA SNP allelic ratio technology - which is the basis for the Down syndrome test we expect to launch in June 2009 - will represent a major step forward in maternal and fetal testing."

Current screening technology for Down syndrome includes serum marker analysis, such as the quad screen and first trimester combined screening that employs both serum marker testing and nuchal translucency. These approaches have detection or sensitivity rates of 80% and 85% respectively, which means between 15% and 20% of all Down syndrome-affected pregnancies will not be identified as needing further evaluation. In addition, these approaches also have false positive rates between 5% and 10%, resulting in hundreds of thousands of unnecessary, highly invasive CVS or amniocentesis procedures. These invasive procedures, which are used to determine whether the fetus has Down syndrome, carry a risk of miscarriage in the range of one-in-100 to one-in-300.

The study, entitled "Noninvasive prenatal diagnosis of fetal chromosomal aneuploidy by massively parallel genomic sequencing of DNA in maternal plasma" by Chiu et. al., is available online in this week's Early Edition of PNAS at www.PNAS.org.

Sequenom's Proprietary Noninvasive Prenatal Diagnostics

Sequenom's commercial opportunities in prenatal diagnostics are built upon its SEQureDx technologies and are enabled by the pioneering inventions and associated intellectual property rights that it has exclusively licensed from Isis Innovation Ltd., the technology transfer company of the University of Oxford, as well as The Chinese University of Hong Kong. Sequenom's portfolio of noninvasive prenatal diagnostic patent rights and patent applications is platform-independent, includes genetic-analysis methods using circulating cell-free fetal nucleic acids from maternal serum, plasma or whole blood, and also includes a portfolio of methylation and nucleic-acid markers. Sequenom holds exclusive rights in territories including the United States, Europe, Australia, Canada, Japan and Hong Kong. Sequenom is actively expanding its intellectual property position with new technology and new territories. Because Sequenom's license rights are platform-independent, the rights provide exclusivity (with the narrow exception in Europe for RT-PCR-based Rhesus D tests) for development and commercialization of noninvasive prenatal screens and tests on any platform and are not limited to the Company's MassARRAY(R) platform.

About SEQureDx Technology

Sequenom's SEQureDx Technology is a novel approach to genetic screening. Unlike current standards of harvesting placental tissue cells as is required for chorionic villus, or entering the uterus to sample the amniotic fluid surrounding the baby as is performed with amniocentesis, SEQureDx Technology extracts Fetal Nucleic Acid material safely and comfortably from a simple blood specimen collected from the mother to determine the genetic status of the fetus. This breakthrough suggests that effective screening may be accomplished in the future without the risks associated with disturbing the amniotic fluid that surrounds the baby in the uterus. In December 2007, the Company, through a laboratory partner, introduced a laboratory-developed RHD genotyping test using RT-PCR in the United States.

Sequenom continues to make substantial progress with its noninvasive Trisomy 21 test based on multiple RNA fetal markers, including the PLAC4 gene as previously published by Dr. Dennis Lo. Recently, Sequenom announced initiation of a 16-month RNA-based Noninvasive Aneuploidy (RNA) study to evaluate its Trisomy 21 technology performance in up to 10,000 women with high-prevalence pregnancies within the first trimester. Led by Drs. Jacob Canick, Ph.D. and Glenn Palomaki from Women & Infants Hospital at Alpert Medical School of Brown University in Providence, Rhode Island, the study's primary goal is to document the performance (clinical sensitivity and false-positive rate) of Sequenom's Trisomy 21 technology that uses fetal RNA in maternal plasma to identify Down syndrome in early pregnancy. The study is expected to be completed post-launch of the Trisomy 21 test.

About Down Syndrome

Down syndrome is a chromosomal abnormality characterized by the presence of an extra copy of genetic material on the 21st chromosome, either in whole (Trisomy 21) or in part (such as due to translocations). The effects of the extra copy vary greatly among people. In 2007, the American College of Obstetricians and Gynecologists (ACOG) endorsed guidelines that offer risk assessment to all pregnancies for fetal chromosomal abnormalities, including Down syndrome. The ACOG recommendation includes screening before the 20th week of pregnancy using a less-invasive screening option that includes ultrasound in conjunction with the measurement of certain blood hormones. It is estimated that approximately 70%, or 2.8 million, women undergo Down syndrome screening in the United States each year.

About Sequenom

Sequenom is committed to providing the best genetic analysis products that translate the results of genomic science into solutions for noninvasive prenatal diagnostics, biomedical research, translational research and molecular medicine applications. The Company's proprietary MassARRAY system is a high-performance (in speed, accuracy and cost efficiency) nucleic acid analysis platform that quantitatively and precisely measures genetic target material and variations. The Company has exclusively licensed intellectual property rights for the development and commercialization of

noninvasive prenatal genetic tests for use with the MassARRAY system and other platforms. For more information on Sequenom, please visit the Company's Web site at www.sequenom.com.

Sequenom(R), MassARRAY(R) and SEQureDx(TM) are trademarks of Sequenom, Inc.

About The Chinese University of Hong Kong

Founded in 1963, The Chinese University of Hong Kong (CUHK) is a forward looking comprehensive research university with a global vision and a mission to combine tradition with modernity, and to bring together China and the West. CUHK teachers and students hail from all corners of the world. In 2007, CUHK had more than 6,100 staff members, approximately 10,000 undergraduate and 3,300 research postgraduate students. Of these students, some 2,500 are from 45 countries and regions outside Hong Kong. The University received research funding of close to HK$400 million in the 2006/07 academic year from various local and overseas sources. Four research areas led by CUHK staff have been selected as four of only ten Areas of Excellence funded by the University Grants Committee. CUHK research centers have close collaboration with mainland China and overseas institutions. Many research products have been put into practical use through technology transfer and spin-off companies. Technology transfer at CUHK is handled by the Technology Licensing Office headed by Ms. Alice Ngan.

Forward-Looking Statements

Except for the historical information contained herein, the matters set forth in this press release, including statements regarding the future of, development, commercialization and related timelines, and expectations regarding massively parallel genomic DNA sequencing approaches to prenatal diagnostics including testing of Down syndrome, other potential DNA sequencing approaches, the Company's expectations regarding its RNA SNP allelic ratio approach for prenatal diagnostics including its potential synergies with the massively parallel genomic DNA sequencing approach, its expected launch in June 2009 and its impact on maternal and fetal testing, the Company's commercial opportunities in prenatal diagnostics, effective prenatal screening in the future, and the goals and expected completion of the Company's RNA-based Noninvasive Aneuploidy study, are forward-looking statements within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995. These forward-looking statements are subject to risks and uncertainties that may cause actual results to differ materially, including the risks and uncertainties associated with the Company's operating performance, demand for and market acceptance of the Company's products, services, and technologies, new technology and product development and commercialization particularly for new technologies such as molecular diagnostics, and particularly noninvasive prenatal diagnostics, reliance upon the collaborative efforts of other parties, research and development progress, competition, intellectual property protection, government regulation, obtaining or maintaining regulatory approvals, and other risks detailed from time to time in the Company's SEC (U.S. Securities and Exchange Commission) filings, including the Company's Annual Report on Form 10-K for the year ended December 31, 2007 and other documents subsequently filed with or furnished to the SEC. These forward-looking statements are based on current information that may change and you are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date of this press release. All forward-looking statements are qualified in their entirety by this cautionary statement, and the Company undertakes no obligation to revise or update any forward-looking statement to reflect events or circumstances after the issuance of this press release.

```
CONTACT: Company Contact:
         Sequenom, Inc.
         Paul V. Hawran, Chief Financial Officer
         858-202-9000
         or
         Investor Relations Contact:
         Lippert/Heilshorn & Associates
         Jody Cain or Kevin Mc Cabe, 310-691-7100
         jcain@lhai.com
         kmccabe@lhai.com
         or
         Media Relations:
         Pure Communications
         Sheryl Seapy, 949-608-0841
```

Source: Sequenom, Inc.

EXHIBIT G

Print Page | Close Window

<< Back

## Sequenom Announces New Positive Data on Down Syndrome Detection and Unveils Breakthrough DNA Approach to Prenatal Diagnostics

### Data Continue to Support Significant Market Potential for Sequenom Prenatal Franchise; Down Syndrome Test on Track for Launch in June 2009

SAN DIEGO--(BUSINESS WIRE)-- Sequenom, Inc. (NASDAQ:SQNM) today announced new positive data from the prospective clinical studies using the Company's noninvasive SEQureDx™ technology, enabling the detection of fetal aneuploidy from maternal blood. The data presented today consist of 459 new, high prevalence samples from the prospective, blinded studies performed at Sequenom, bringing the total number of samples studied to 858. Based on the results from the total study samples, including samples as early as 8 weeks of pregnancy, the Sequenom SEQureDx RNA-based technology demonstrated a 100% positive predictive value (PPV) and a 99.9% negative predictive value (NPV). The SEQureDx technology achieved a better than 99% detection rate, with less than a 1% false positive rate. The current standard of care, screening tests, perform at less than a 99% detection rate; however, statistically, if these screening tests could perform at a 99% detection rate, their false positive rate would be in the 10% to 25% range. SEQureDx compares favorably to the current invasive procedures, such as amniocentesis.

In addition to data on the RNA-based technology, the Company unveiled a breakthrough technology which further enhances Sequenom's SEQureDx technology. This new DNA approach has demonstrated in early studies universal ethnic coverage, high sensitivity and specificity, and the ability to detect Trisomy 21 (Down syndrome), Trisomy 18 (Edwards syndrome) and Trisomy 13 (Patau syndrome) in a single test. This technology is being developed as a "reflex test" for unresolved results from the current SEQureDx Trisomy 21 technology will be available at the time of the launch of the Trisomy 21 laboratory developed test (LDT) in June 2009.

"We are very pleased with the completion of the R&D studies for our Trisomy 21 RNA-based technology," stated Harry Stylli, Ph.D., President and Chief Executive Officer of Sequenom. "Our highly sensitive and specific Down syndrome technology will be transferred to the Sequenom Center for Molecular Medicine (SCMM) to complete the development and validation phases necessary for launch in June as an LDT. Our pioneering DNA approach is proving to be a powerful approach to detecting a wide range of aneuploidies. We are very excited by these early findings and believe it will play a key role in our prenatal diagnostics franchise as it eliminates unresolved results due to ethnic coverage and has shown sensitivity as early as eight weeks, similar to the current RNA approach. Furthermore, we believe it will have broad applicability in other areas such as cancer aneuploidies and other genetic disorders. This new approach and other approaches being developed by the Company are covered by existing and recently filed patents."

### Overview of Data from Screening Studies Evaluating RNA-based Trisomy 21 Technology

Elizabeth Dragon, Ph.D., Senior Vice President of Research and Development at Sequenom, presented data from blinded studies performed at Sequenom involving 459 new, high prevalence clinical samples collected prospectively, which brings the total number of samples studied to 858. The data from the 459 new samples show that Sequenom's proprietary technology for Down syndrome correctly identified all eight first trimester Down syndrome samples (i.e. sensitivity or detection rate) with no false positives and no false negatives, as confirmed by chorionic villus sampling (CVS). Of the 15 second trimester confirmed Down syndrome samples, the Sequenom RNA-based technology detected 14 samples, with one unresolved result reflexed to the new DNA-based method. The DNA-based method accurately detected the Down syndrome. There was one false positive in the second trimester samples, which would be reflexed for confirmatory genetic testing per American College of Obstetricians and Gynecologists (ACOG) guidelines.

"These results represent a significant advance in noninvasive prenatal screening," stated Allan T. Bombard, M.D., Chief Medical Officer of Sequenom. "In light of these outstanding results, the SEQureDx RNA-based Trisomy 21 technology clearly represents a paradigm-shifting approach. I am encouraged by the single false-positive result in this study representing one tenth of one percent of the total samples tested to-date, and the detection rate is notably superior to the current standard of care, biochemical screening tests. As an ob-gyn, I am confident the simplicity of the

SEQureDx approach will be invaluable to physicians and the patients they care for and will result in substantially fewer invasive procedures."

### Breakthrough DNA Approach to Detection of Trisomy 21 and Other Aneuploidies

In addition, Dennis Lo, M.D. Ph.D., Li Ka Shing Professor of Medicine at The Chinese University of Hong Kong, presented insights in future opportunities for noninvasive prenatal diagnostics, including pioneering work in a novel DNA approach to the detection of fetal aneuploidy, an approach which Sequenom is already evaluating in R&D studies.

Dr. Dragon from Sequenom presented early findings regarding this promising technology from 359 samples. These findings showed that the DNA-based method correctly identified all 68 unresolved results reflexed from the RNA method, including one confirmed positive Trisomy 21 sample. In addition, this method correctly identified four confirmed positive Trisomy 13 samples and four confirmed positive Trisomy 18 samples.

"We believe this technology represents a breakthrough approach for detecting chromosomal aneuploidies," stated Dr. Dragon. "This method provides a universal method for detecting all chromosomal aneuploidies. The simple integration into RNA lab workflow of this MassARRAY-based technology does not impact timelines or costs. We will continue to evaluate this technology in parallel to the RNA method and plan to incorporate the DNA-based method into our launch plans."

### Future Applications in Detection of Monogenic Diseases

During his presentation, Dr. Lo focused on the future potential for Sequenom's technology to address the unmet needs in detection of monogenic diseases. Currently, monogenic diseases, such as cystic fibrosis, B-thalassemia and sickle cell anemia, can only be definitively diagnosed prenatally through invasive procedures following extensive carrier screening testing on both parents. In the United States, cystic fibrosis screening is recommended for all women of child bearing age (more than 10 million individuals in the U.S. are carriers of the CF mutated gene, including one in every 29 Caucasian Americans) and in certain regions of the world, B-thalassemia affects anywhere from three to 16 percent of the population.

Data presented by Dr. Lo demonstrate that when individual mutant or normal DNA sequences are counted in maternal plasma using digital PCR technology, the number of mutant genes inherited by an unborn fetus, and hence its disease status, can be determined. He further demonstrated that a 'molecular counting' strategy can be made more efficient by taking into account the length of the DNA molecules in maternal plasma, as fetal DNA molecules are known to typically be shorter than the maternally derived molecules in maternal plasma. This digital counting approach enables the noninvasive diagnosis of B-thalassemia and hemoglobin E disease from maternal plasma—forms of inherited anemias that affect millions of people worldwide. This molecular counting strategy can, in principle, be applicable to all forms of monogenic diseases, namely paternally or maternally inherited, autosomal dominant diseases and autosomal recessive diseases with any combination of parental mutations. Thus, the complete diagnosis of monogenic diseases can be achieved noninvasively. Sequenom holds exclusive rights to this breakthrough technology representing a new approach that could potentially eliminate the need for paternal testing and significantly reduce the use of invasive tests.

"This new diagnostic approach addresses a problem that has been puzzling investigators in the field of noninvasive prenatal diagnostics over the last 10 years," stated Dr. Lo, study co-author. "Digital PCR technologies have enabled us to measure the minute imbalance of mutant and normal DNA sequences in maternal plasma. This has freed us from the past restriction for monogenic disease analysis where we could only look at the paternally-inherited mutations noninvasively. This research represents a significant paradigm shift in the way we approach plasma DNA-based diagnostics, and offers substantial promise for bringing noninvasive prenatal diagnosis of monogenic diseases closer to reality."

"Sequenom is committed to developing the next generation of prenatal diagnostic tools that will provide physicians with the capabilities they need to noninvasively diagnose genetic disorders early in a woman's pregnancy," commented Dr. Stylli. "We believe these unique, noninvasive digital technologies have the potential to dramatically impact the prenatal diagnostic market and we look forward to advancing these innovative approaches as part of our long-term strategy to expand our prenatal diagnostics franchise."

Sequenom's analyst briefing included the following speakers and topics:

- Sequenom Business Overview and Update, Harry Stylli, Ph.D., President and Chief Executive Officer

- Trisomy 21 R&D Study Results, Elizabeth Dragon, Ph.D., Senior Vice President of Research and Development

- Glimpse into the Future of Aneuploidy Screening, Elizabeth Dragon, Ph.D., Senior Vice President of Research and Development

- Impact on Clinical Practice, Allan T. Bombard, M.D., Chief Medical Officer

- Understanding the Regulatory Landscape, Gary Riordan, Vice President, Regulatory Affairs and Quality

- Future Applications in Noninvasive Prenatal Diagnostics, Dennis Lo, M.D. Ph.D., Professor of Medicine at The Chinese University of Hong Kong

A webcast of the presentation will be available for 90 days following the event on the Company's Web site at www.sequenom.com.

### Sequenom's Proprietary Noninvasive Prenatal Diagnostics

Sequenom's commercial opportunities in prenatal diagnostics are built upon its SEQureDx technologies and are enabled by the pioneering inventions and associated intellectual property rights that it has exclusively licensed from Isis Innovation Ltd., the technology transfer company of the University of Oxford, as well as The Chinese University of Hong Kong. Sequenom's portfolio of noninvasive prenatal diagnostic patent rights and patent applications is platform-independent, includes genetic-analysis methods using circulating cell-free fetal nucleic acids from maternal serum, plasma or whole blood, and also includes a portfolio of methylation and nucleic-acid markers. Sequenom holds exclusive rights in territories including the United States, Europe, Australia, Canada, Japan and Hong Kong. Sequenom is actively expanding its intellectual property position with new technology and new territories. Because Sequenom's license rights are platform-independent, the rights provide exclusivity (with the narrow exception in Europe for RT-PCR-based RhD tests) for development and commercialization of noninvasive prenatal screens and tests on any platform and are not limited to the Company's MassARRAY platform.

### About SEQureDx Technology

Sequenom's SEQureDx Technology is a novel approach to genetic screening. Unlike current standards of harvesting placental tissue cells as is required for CVS, or entering the uterus to sample the amniotic fluid surrounding the baby as is performed with amniocentesis, SEQureDx Technology extracts fetal nucleic acid material safely and comfortably from a simple blood specimen collected from the mother to determine the genetic status of the fetus. This breakthrough suggests that effective screening may be accomplished in the future without the risks associated with disturbing the amniotic fluid that surrounds the baby in the uterus. In December 2007, the Company, through its laboratory partner, introduced a laboratory-developed RhD genotyping test using RT-PCR in the United States. In February 2008, Sequenom announced progress with its noninvasive Trisomy 21 test based on multiple RNA fetal markers, including the PLAC4 gene as previously published by Dr. Dennis Lo, The Chinese University of Hong Kong.

### About Down Syndrome

Down syndrome is a chromosomal abnormality characterized by the presence of an extra copy of genetic material on the 21st chromosome, either in whole (Trisomy 21) or in part (such as due to translocations). The effects of the extra copy vary greatly among people, depending on the extent of the extra copy, genetic history and pure chance. In 2007, the American College of Obstetricians and Gynecologists (ACOG) endorsed guidelines that offer risk assessment to all pregnancies for fetal chromosomal abnormalities, including Down syndrome. The ACOG recommendation includes screening before the 20th week of pregnancy using a less-invasive screening option that includes ultrasound in conjunction with the measurement of certain blood hormones. It is estimated that approximately 78% of all births, or 2.7 million pregnancies, undergo Down syndrome screening in the United States each year.

### About Sequenom

Sequenom is committed to providing the best genetic analysis products that translate the results of genomic science into

solutions for noninvasive prenatal diagnostics, biomedical research, translational research and molecular medicine applications. The Company's proprietary MassARRAY$^{®}$ system is a high-performance (in speed, accuracy and cost efficiency) nucleic acid analysis platform that quantitatively and precisely measures genetic target material and variations. The Company has exclusively licensed intellectual property rights for the development and commercialization of noninvasive prenatal genetic tests for use with the MassARRAY system and other platforms. Sequenom maintains a Web site at www.sequenom.com to which Sequenom regularly posts copies of its press releases as well as additional information about Sequenom. Interested persons can subscribe on the Sequenom Web site to email alerts or RSS feeds that are sent automatically when Sequenom issues press releases, files its reports with the Securities and Exchange Commission (the "SEC") or posts certain other information to the Web site.

Sequenom$^{®}$, MassARRAY$^{®}$ and SEQureDx$^{™}$ are trademarks of Sequenom, Inc.

**Forward Looking Statements**

*Except for the historical information contained herein, the matters set forth in this press release, including statements regarding the Company's SEQureDx Technology and a novel DNA-based approach to the detection of fetal aneuploidy, including the potential applications, benefits and impact of such technologies, the sensitivity and specificity of such technologies, the continuing development, validation and commercialization of such technologies and the expected availability of diagnostic tests utilizing such technologies, future opportunities for and benefits of noninvasive prenatal diagnostic tests, including potential applications for the diagnosis of monogenic diseases and other diseases, the expansion of Sequenom's intellectual property position, and Sequenom's ability to develop and commercial diagnostic tests on multiple platforms, are forward-looking statements within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995. These forward-looking statements are subject to risks and uncertainties that may cause actual results to differ materially, including the risks and uncertainties associated with demand for and market acceptance of Sequenom's products, services, and technologies, new technology and product development and commercialization, reliance upon the collaborative efforts of other parties, research and development progress, competition, government regulation particularly with respect to diagnostic products and laboratory developed tests, obtaining or maintaining regulatory approvals, and other risks detailed from time to time in the Company's SEC reports, including the Company's Annual Report on Form 10-K for the year ended December 31, 2007 and subsequent filings. These forward-looking statements are based on current information that is likely to change and speak only as of the date hereof. You are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date of this press release. All forward-looking statements are qualified in their entirety by this cautionary statement, and the Company undertakes no obligation to revise or update any forward-looking statement to reflect events or circumstances after the issuance of this press release.*

Source: Sequenom, Inc.

**Company Contact**
Sequenom, Inc.
Paul W. Hawran
Chief Financial Officer
858-202-9000
or
**Investor Relations Contact**
Lippert/Heilshorn & Associates
Jody Cain or Kevin Mc Cabe
310-691-7100
jcain@lhai.com
kmccabe@lhai.com
or
**Media Relations**
Pure Communications Inc..

Andrea Johnston, 910-509-3970
Sheryl Seapy, 949-608-0841

EXHIBIT H

Print Page | Close Window

<< Back

## Sequenom Announces Findings on Methylation Markers and RNA-SNP Markers as Presented at SMFM

### Company Provides Additional Details on SEQureDx Trisomy 21 Technology Performance Data

SAN DIEGO--(BUSINESS WIRE)-- Sequenom, Inc. (NASDAQ: SQNM) today announced new data showing the discovery of DNA methylation markers for Trisomy 21 (Down syndrome), Trisomy 18 (Edwards syndrome) and Trisomy 13 (Patau syndrome) and identification of chromosome RNA-SNP markers for early detection of Trisomies 18 and 13. The data were presented on Thursday and Friday, January 29 and January 30, 2009, at the 29th annual meeting of the Society for Maternal-Fetal Medicine (SMFM). In addition, Sequenom announced more information regarding the performance of its Down syndrome test at a separate meeting held concurrently in San Diego.

"Sequenom is committed to reinforcing its leadership in the noninvasive prenatal arena with innovative, proprietary technologies for chromosomal disorders, and monogenic, polygenic diseases using discrete and whole genome approaches," said Harry Stylli, Ph.D., President and Chief Executive Officer of Sequenom. "Our discoveries regarding new DNA methylation and RNA-SNP markers for Trisomies 21, 18, 13 will help expand our future assay offerings. Also, our new, proprietary DNA-based testing method, which was presented at our analyst meeting, complements our RNA-based strategy, especially as a reflex for homozygote no calls. The DNA-based method has the potential to work universally for T21, T18, T13 and gender determination in a single tube."

In an oral session presented at the SMFM meeting, Mathias Ehrich, M.D., Scientific Group Leader of Sequenom, highlighted the discovery of DNA methylation markers for prenatal aneuploidy testing in a presentation entitled "Discovery of DNA Methylation Markers for Prenatal Aneuploidy." The genome-wide methylation analysis identified more than 3,000 differentially methylated regions with approximately 90% confirmation; study results showed proof-of-concept for the sensitive detection of aneuploidies.

In a poster session at the SMFM meeting entitled "Identification of RNA-SNP Markers for Noninvasive Prenatal Diagnosis (NIPD) of T18 and T13," an exon array was utilized to compare gene expression profiles and identify SNPs using matched placenta and maternal PBMC RNA samples. All SNP candidates were then screened using 100 human diversity genomic DNA samples of various ethnicities to measure the heterozygote rate (HR) for each SNP. SNPs with an HR of 4 percent or greater were retested using placental RNA samples. Four SNPs from one C13 gene and three C18 genes were selected for assay development based on positive placental RNA results and additional SNPs within these genes will be validated to expand population coverage for T13 and T18 screening using the RNA-based method.

The RNA, DNA and methylation marker variations of the SEQureDx™ Technology are being developed in parallel and may be validated in the same studies. All may ultimately be commercialized and prove complementary in some or all patients.

### Additional Data from Screening Studies Evaluating RNA-based SEQureDx Trisomy 21 Technology

During an analyst and investor briefing held concurrently with the SMFM meeting, Sequenom presented new data evaluating its prenatal screening technology for Down syndrome. The data presented consisted of 459 new samples from prospective, blinded studies performed at Sequenom, bringing the total number of samples studied to 858. The test correctly identified all 22 T21 positive samples from the 459 new samples including eight first-trimester and 14 second-trimester Down syndrome samples (i.e. 100% sensitivity or detection rate) with one false positive and no false negatives, as confirmed by chorionic villus sampling (CVS) and amniocentesis. The DNA-based method correctly detected the one homozygous sample that the RNA-based method did not resolve (i.e., that had been deemed a "no-call").

A summary of the results for the 459 new samples including samples as early as 8 weeks of pregnancy are as follows:

- Specificity of 99.7% (99.4% - 100%) and 100% sensitivity (85.1 – 100%) at a 95 % confidence interval;
- The Positive Predictive Value is 95.6% (79.0% -99.8%) and the Negative Predictive Value of 100.0% (99.9% - 100%) at a 95% confidence interval;

- The SEQureDx RNA test had a total of 65 unresolved results ("no-calls") due to homozygotes (60) and unacceptably low RNA levels (5) for a total of 10.5%. The DNA-based method analyzed 68 of the homozygote "no-calls" and all were successfully resolved;

- The distribution of the 459 samples actually collected as compared to the expected rate in the U.S. population was Caucasian (282 vs. 307), Asian (101 vs. 20), African American (12 vs. 62) Hispanic (62 vs. 68) and Native American (2 vs. 3).

"We are pleased with the progress of our research efforts and look forward to transferring the technology to our CLIA facility soon for commercial launch in June," said Dr. Betty Dragon, Senior Vice President Research & Development. "We are confident that our no call rate for homozygote samples will improve as the patient population increases and the ethnic distribution normalizes. We expect that in the final test, ethnic coverage will be better than 95% of the U.S. population. Identification of additional SNPs by ongoing sequencing of the relevant genes of homozygote patients, coupled with modest improvements in marker recovery, will further expand the ethnic coverage of the RNA-based test.

"Furthermore, when compared to amniocentesis or CVS, the new DNA-based method correctly identified all 68 homozygotes tested including a no-call T21 sample and a no call T18 sample. The DNA-based test shows great promise as a reflex to the RNA method or potentially as a front-line test in its own right," added Dr. Dragon.

Based on the results from the 858 total study samples, the Sequenom SEQureDx RNA-based technology demonstrated:

- Specificity of 99.9% (99.2% - 100.0%) and 100% sensitivity (87.9% - 100.0%) at a 95% confidence interval;

- The Positive Predictive Value is 96.6% (82.8% -99.6%) and the Negative Predictive Value of 100.0% (99.5% - 100%) at a 95% confidence interval;

- The SEQureDx RNA test had a total of 106 unresolved results ("no-calls") due to homozygotes (94) and unacceptable RNA levels (12) or a total of 12.4%. The DNA-based method, when applied, resolved all no calls;

- SEQureDx is considerably more accurate than commonly employed standard-of-care screening tests, which perform at a 70%-90% detection rate (i.e., sensitivity) with a 90%-95% specificity in practice. SEQureDx even compares favorably to current invasive procedures, such as amniocentesis (which has sensitivity and specificity of approximately 99.5%).

### Sequenom's Proprietary Noninvasive Prenatal Diagnostics

Sequenom's commercial opportunities in prenatal diagnostics are built upon its SEQureDx technologies and are based upon its intellectual property rights including, but not limited to, the pioneering inventions and associated intellectual property rights exclusively licensed from Isis Innovation Ltd., the technology transfer company of the University of Oxford, as well as from The Chinese University of Hong Kong. Sequenom's portfolio of noninvasive prenatal diagnostic patent rights and patent applications is platform-independent, includes genetic-analysis methods using circulating cell-free fetal nucleic acids from maternal serum, plasma or whole blood, and also includes a portfolio of methylation and nucleic-acid markers. Sequenom holds exclusive rights in territories including the United States, Europe, Australia, Canada, Japan and Hong Kong. Sequenom is actively expanding its intellectual property position with new technology and new territories. Because Sequenom's license rights are platform-independent, the rights provide exclusivity (with the narrow exception in Europe for RT-PCR-based Rhesus D tests) for development and commercialization of noninvasive prenatal screens and tests on any platform and are not limited to the Company's MassARRAY® platform.

### About SEQureDx Technology

Sequenom's SEQureDx Technology is a novel approach to genetic screening. Unlike current standards of harvesting placental tissue cells as is required for chorionic villus, or entering the uterus to sample the amniotic fluid surrounding the baby as is performed with amniocentesis, SEQureDx Technology extracts Fetal Nucleic Acid material from a simple blood specimen collected safely and comfortably from the mother to determine the genetic status of the fetus. This breakthrough suggests that effective screening may be accomplished in the future without the risks associated with disturbing the amniotic fluid that surrounds the baby in the uterus. In December 2007, the Company, through a laboratory partner, introduced a laboratory-developed RHD genotyping test using RT-PCR in the United States.

Sequenom continues to make substantial progress with its noninvasive Trisomy 21 test based on multiple RNA fetal markers, including the PLAC4 gene as previously published by Dr. Dennis Lo. Recently, Sequenom announced initiation of a 16-month RNA-based Noninvasive Aneuploidy (RNA) study to evaluate its Trisomy 21 technology performance in up to 10,000 women. Led by Drs. Jacob Canick, Ph.D. and Glenn Palomaki from Women & Infants Hospital at Alpert Medical School of Brown University in Providence, Rhode Island, the study's primary goal is to document the performance (clinical sensitivity and false-positive rate) of Sequenom's Trisomy 21 technology that uses fetal RNA in maternal plasma to identify Down syndrome in early pregnancy. The study is expected to be completed in stages following the commercial launch of the Trisomy 21 test, with the second-trimester cohort slated for completion in the fall of 2009 and the first-trimester cohort by mid-2010. The DNA-based method is advancing rapidly for development and may be validated and launched in a similar timeframe to the RNA-test. The RNA and DNA tests are complementary elements of the SEQureDx non-invasive prenatal genetic testing technology.

### About Sequenom

Sequenom is committed to providing the best genetic analysis products that translate the results of genomic science into solutions for noninvasive prenatal diagnostics, biomedical research, translational research and molecular medicine applications. The Company's proprietary MassARRAY system is a high-performance (in speed, accuracy and cost efficiency) nucleic acid analysis platform that quantitatively and precisely measures genetic target material and variations. The Company has exclusively licensed intellectual property rights for the development and commercialization of noninvasive prenatal genetic tests for use with the MassARRAY system and other platforms. For more information on Sequenom, please visit the Company's Web site at www.sequenom.com.

Sequenom$^{\textregistered}$, MassARRAY$^{\textregistered}$ and SEQureDx$^{\text{TM}}$ are trademarks of Sequenom, Inc.

### Forward-Looking Statements

*Except for the historical information contained herein, the matters set forth in this press release, including statements regarding reinforcing the Company's leadership in the non-invasive prenatal arena with innovative proprietary technologies, the Company's future assay offerings, the potential of the Company's DNA-based method, the Company's intentions to validate additional SNPs within C13 and C18 genes, transferring the Company's technology to its CLIA facility for commercial launch in June, the Company's expectations regarding test improvement and ethnic coverage improvement, the Company's commercial opportunities in prenatal diagnostics, expansion of the Company's intellectual property position, effective genetic screening of a fetus in the future, the development, commercialization and related timelines, and expectations regarding the Company's RNA-based test and DNA-based methods for detecting aneuploidies, and the expected completion, timeline for completion, and goals of the Company's RNA-based Noninvasive Aneuploidy (RNA) study, are forward-looking statements within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995. These forward-looking statements are subject to risks and uncertainties that may cause actual results to differ materially, including the risks and uncertainties associated with the Company's operating performance, demand for and market acceptance of the Company's products, services, and technologies, new technology and product development and commercialization particularly for new technologies such as molecular diagnostics, and particularly noninvasive prenatal diagnostics, reliance upon the collaborative efforts of other parties, research and development progress, competition, intellectual property protection, government regulation, obtaining or maintaining regulatory approvals, and other risks detailed from time to time in the Company's SEC (U.S. Securities and Exchange Commission) filings, including the Company's Annual Report on Form 10-K for the year ended December 31, 2007 and other documents subsequently filed with or furnished to the SEC. These forward-looking statements are based on current information that may change and you are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date of this press release. All forward-looking statements are qualified in their entirety by this cautionary statement, and the Company undertakes no obligation to revise or update any forward-looking statement to reflect events or circumstances after the issuance of this press release.*

Source: Sequenom, Inc.

Sequenom, Inc.
Paul W. Hawran
Chief Financial Officer
858-202-9000

or
**Investor Relations Contact**
Lippert/Heilshorn & Associates
Jody Cain or Kevin Mc Cabe
310-691-7100
jcain@lhai.com
kmccabe@lhai.com
or
**Media Relations**
Pure Communications Inc.
Andrea Johnston, 910-609-3970
Sheryl Seapy, 949-608-0841

EXHIBIT I

Print Page | Close Window

<< Back

### SEQUENOM Announces Delay in Launch of SEQureDx Trisomy 21 Test

SAN DIEGO--(BUSINESS WIRE)--Apr. 29, 2009-- SEQUENOM, Inc. (NASDAQ: SQNM) announced today that the expected launch of its SEQureDx™ Down syndrome test is delayed, due to the discovery by company officials of employee mishandling of R&D test data and results. Accordingly the company is no longer relying on the previously announced R&D test data and results. SEQUENOM has not changed its plans to develop in parallel its RNA- and DNA-based methods for the Down syndrome test and will endeavor to have a validated test in the fourth quarter of 2009. Under the circumstances, and as supported by key clinical opinion leaders, the company now intends to launch the Down syndrome test upon publication in a peer-reviewed journal of the results from the on-going large, independent clinical studies, which are designed to be practice-changing for Down syndrome testing.

The company's board of directors has formed a special committee of independent directors to oversee an independent investigation of the employees' activity related to the test data and results. The committee has engaged independent counsel to assist the committee in the conduct of the investigation.

Although the company is not aware of any potentially inappropriate activity related to the reported results of its other tests under development, the company is currently reviewing the data for all tests. As a result of this ongoing review the Rhesus D, Cystic Fibrosis and Fetal[RY] tests are now anticipated to begin launching in the third quarter of this year.

The company believes that its Down syndrome program has suffered a temporary setback but that the SEQureDx technology is scientifically and technically sound. The company intends to take every possible action to make up lost ground. SEQUENOM believes that it has the financial resources to commercialize its test for Down syndrome and other prenatal disorders.

Today's announcement regarding the company's SEQureDx Down syndrome R&D test data and results supersedes all previous announcements about such data and test, including its press releases dated June 4, 2008, September 23, 2008, December 1, 2008, January 28, 2009 and February 3, 2009.

SEQUENOM has scheduled a conference call for 2:00 p.m. Pacific time today at which Harry Stylli, PhD, SEQUENOM President and Chief Executive Officer, will discuss this announcement and along with other company officials will present information on the company's operating results for the first quarter of fiscal 2009. A separate press release setting forth information on the company's first quarter operating results will be issued prior to the call. Individuals interested in participating in the conference call may do so by dialing (866) 844-2898 for domestic callers or (706) 679-9912 for international callers. Those interested in listening to the conference call live via the Internet may do so by visiting the investor relations section of the company's website at www.sequenom.com.

A webcast replay will be available on the SEQUENOM Web site for 14 days. A telephone replay will be available for 48 hours following the conclusion of the call by dialing (800) 642-1687 for domestic callers, or (706) 645-9291 for international callers, and entering reservation code 93862699.

Because the company has accelerated the announcement of its first quarter operating results to coincide with today's call, the company has cancelled the conference call originally scheduled for Thursday, April 30, 2009.

### About SEQUENOM

SEQUENOM is committed to providing the best genetic analysis products that translate the results of genomic science into solutions for noninvasive prenatal diagnostics, biomedical research, translational research and molecular medicine applications. The company's proprietary MassARRAY® system is a high-performance (in speed, accuracy and cost efficiency) nucleic acid analysis platform that quantitatively and precisely measures genetic target material and variations. The company has exclusively licensed intellectual property rights for the development and commercialization of noninvasive prenatal genetic tests for use with the MassARRAY system and other platforms. SEQUENOM maintains a

Web site at www.sequenom.com to which SEQUENOM regularly posts copies of its press releases as well as additional information about SEQUENOM. Interested persons can subscribe on the SEQUENOM Web site to email alerts or RSS feeds that are sent automatically when SEQUENOM issues press releases, files its reports with the Securities and Exchange Commission or posts certain other information to the Web site.

SEQUENOM®, MassARRAY® and SEQureDx™ are trademarks of SEQUENOM, Inc.

**Forward-Looking Statements**

*Except for the historical information contained herein, the matters set forth in this press release, including statements regarding the Company's current plans to develop and launch a Down syndrome test and other diagnostic tests and the sufficiency of its financial resources to do so and the Company's ability to develop and commercialize diagnostic tests on multiple platforms, are forward-looking statements within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995. These forward-looking statements are subject to risks and uncertainties that may cause actual results to differ materially, including the risks and uncertainties associated with the Company's ability to develop and commercialize new technologies and products, particularly new technologies such as noninvasive prenatal diagnostics and laboratory developed tests, reliance upon the collaborative efforts of other parties, the Company's ability to manage its existing cash resources or raise additional cash resources, competition, intellectual property protection and intellectual property rights of others, government regulation particularly with respect to diagnostic products and laboratory developed tests, obtaining or maintaining regulatory approvals, the independent investigation and other risks detailed from time to time in the Company's Annual Report on Form 10-K for the year ended December 31, 2008 and other documents subsequently filed with or furnished to the Securities and Exchange Commission. These forward-looking statements are based on current information that may change and you are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date of this press release. All forward-looking statements are qualified in their entirety by this cautionary statement, and the Company undertakes no obligation to revise or update any forward-looking statement to reflect events or circumstances after the issuance of this press release.*

Source: SEQUENOM, Inc.

Company Contact
SEQUENOM, Inc.
Ian Clements
Sr. Director, Corp. Communications
+1 (858) 202-9000
or
Investor Relations Contact
Lippert/Heilshorn & Associates
Jody Cain (jcain@lhai.com)
Kevin Mc Cabe (kmccabe@lhai.com)
+1 (310) 691-7100
or
Media Relations
Pure Communications
Andrea Johnston
+1 (910) 509-3970

EXHIBIT J

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM 8-K

### CURRENT REPORT
### PURSUANT TO SECTION 13 OR 15(d) OF THE
### SECURITIES EXCHANGE ACT OF 1934

Date of report (Date of earliest event reported): May 1, 2009

# SEQUENOM, INC.
(Exact Name of Registrant as Specified in Charter)

| DELAWARE | 000-29101 | 77-0365859 |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**3595 JOHN HOPKINS COURT
SAN DIEGO, CALIFORNIA 92121**
(Address of Principal Executive Offices)

**(858) 202-9000**
(Registrant's telephone number, including area code)

**N/A**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Source: SEQUENOM INC, 8-K, May 04, 2009

Item 8.01    Other Events.

On May 1, 2009, several separate complaints were filed in the U.S. District Court for the Southern District of California against us and certain of our executive officers on behalf of certain purchasers of our common stock. Each of the complaints allege violations of the Securities Exchange Act of 1934, as amended (the "1934 Act"), and have been brought on purported shareholder class actions under Sections 10(b) and 20(a) of the 1934 Act. In general, the complaints allege that we and certain of our executive officers issued materially false and misleading statements regarding our Down syndrome test under development, thereby artificially inflating the price of our common stock. The plaintiffs are seeking unspecified monetary damages and other relief.

We have not yet been served with any of the complaints nor have we responded to any of these lawsuits. We will vigorously defend against the claims advanced. The actions will be tendered to our insurance carriers

The following information is being filed for the purpose of updating our publicly disclosed description of risk factors.

Risk Factors

*You should consider carefully the following risk factor, together with all of the other information included in this Current Report. If any of such risks actually occur, our business could be materially harmed, and our financial condition and results of operations could be materially and adversely affected. The risks and uncertainties described below and in our Annual Report on Form 10-K for the fiscal year ended December 31, 2008 in Item 1A under "Risk Factors," and as updated in any future filings we make with the Securities and Exchange Commission, are not the only ones facing us. Additional risks and uncertainties, not presently known to us, or that we currently see as immaterial, may also harm our business.*

**We and certain of our executive officers have been named as defendants in recently initiated securities class action litigations that could result in substantial costs and divert management's attention.**

We are aware of lawsuits in which we, and certain of our executive officers, have been sued for alleged violations of federal securities laws related to alleged false and misleading statements regarding our Down syndrome test under development. We intend to engage in a vigorous defense of such claims. If we are not successful in our defense of such claims, we could be forced to make significant payments to our stockholders and their lawyers, and such payments could have a material adverse effect on our business, operating results or financial condition if not covered by our insurance carriers. Even if such claims are not successful, the litigation could result in substantial costs and divert management's attention and resources, which could have a material adverse effect on our business, operating results or financial condition.

Forward-Looking Statements

*Except for the historical information contained herein, the matters set forth in this Current Report, including statements related to the defense of the litigation described in this Current Report and any potential results of such litigation, are forward-looking statements within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995. These forward-looking statements are subject to risks and uncertainties that may cause actual results to differ materially, including that the litigation may*

2.

Source: SEQUENOM INC, 8-K, May 04, 2009

result in significant costs and expenses and could divert management's attention, that we may not be successful in defending against these claims, that we could be forced to make a significant settlement or judgment payment to the plaintiffs, and other risks detailed in our Annual Report on Form 10-K for the year ended December 31, 2008 and other documents subsequently filed with or furnished to the Securities and Exchange Commission. These forward-looking statements are based on current information that may change and you are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date of this Current Report. All forward-looking statements are qualified in their entirety by this cautionary statement, and we undertake no obligation to revise or update any forward-looking statement to reflect events or circumstances after the issuance of this Current Report.

3.

Source: SEQUENOM INC, 8-K, May 04, 2009

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

SEQUENOM, INC.

Date: May 4, 2009

By:    /s/ Clarke W. Neumann
        Clarke W. Neumann
        Vice President and General Counsel

4.

Created by 10K Wizard   www.10KWizard.com

Source: SEQUENOM INC, 8-K, May 04, 2009

EXHIBIT K



*X e n o m i c s  I n c .*
One   Deer   Park   Drive
Suite   F
Monmouth   Junction, NJ   08852
732.438.8290

May 22, 2009

<u>Facsimile (858-202-9020)</u>

Clarke W. Neumann, Esq.
General Counsel
Sequenom, Inc.
3595 John Hopkins Court
San Diego, CA 92121

Re:  <u>Xenomics-Sequenom License Agreement</u>

Dear Mr. Neumann:

As you are aware, Xenomics entered into a License Agreement with Sequenom dated October 29, 2008 (the "Agreement") under which Xenomics licensed to Sequenom certain Xenomics technology for commercialization by Sequenom.   Sequenom filed a Form 8-K with the Securities and Exchange Commission on April 29, 2009, and issued a press release which disclosed, among other things, that Sequenom's SEQureDx Down syndrome research and development test data and results were materially compromised due to employee mishandling. Worse, the Form 8-K report states that, as a consequence, Sequenom no longer has confidence in any of its test data, and, in addition to initiating an independent investigation of the SEQureDx Down syndrome matter, is currently reviewing its research and development test data for all tests.

Moreover, Xenomics has also learned that, as a result of these developments and an apparent loss of faith and trust in the company, Sequenom's shareholders have filed several class action lawsuits in the United States District Court for the Southern District of California, asserting, among other things, that Sequenom has defrauded them.

This is a matter of grave concern to Xenomics and threatens severe direct and consequential damages as a result of Sequenom's conduct.  Xenomics entered into the Agreement after being led to believe that Sequenom possessed (i) the resources, technical expertise and scientific discipline and (ii) quality of reputation needed to promote effectively Xenomics' technology in the marketplace.  However, the recent shocking events involving Sequenom, including intentional misconduct of its own employees, demonstrate beyond doubt that, in fact, Sequenom lacked the scientific discipline, technical expertise and, now, reputation, that it represented during our negotiations of the Agreement.  What relevant reputation and qualities Sequenom may have had at the time we negotiated the Agreement, Sequenom has now clearly lost.  The failure of Sequenom to disclose to Xenomics, during our discussions while negotiating the Agreement, the facts that have come to light only recently constitute material omissions of facts which expose Xenomics to potentially millions of dollars of damages.

Xenomics intent and purposes in entering into the Agreement was to license the right to use Xenomics' patented technology and know-how to Sequenom, which (i) would enable Sequenom, using its professed resources and scientific expertise in the field, to develop Licensed Diagnostic Products and Licensed

2 | May 20, 2009

Research Products based on Xenomics' technology, (ii) to commercially exploit such Licensed Products, in each case, as contemplated under Section 2.1 of the Agreement using Sequenom's professed marketing acumen and industry and market reputation, and (iii) generate royalty revenue for Xenomics pursuant to Section 4 of the Agreement. However, the recent public admissions of data irregularities makes it abundantly clear that Sequenom, at the time it entered into the Agreement, was neither capable nor intending to perform its development and marketing obligations under the Agreement. It has also become clear that Sequenom's concealed misconduct will have the result of denying Xenomics the benefits of its Agreement with Sequenom, which constitutes a breach by Sequenom of the covenant of good faith and fair dealing inherent in the Agreement, and will cause devastating harm to Xenomics and its shareholders.

Sequenom needs to focus its undivided attention on its internal investigation, restoring order in its own house, weeding out untrustworthy employees, determining which data are or are not reliable, attempting to regain trust and confidence of investors and the medical marketplace--which very well may be impossible--and defending the numerous class action lawsuits. Sequenom is not well-positioned to market Xenomics' technology as was represented, and as Xenomics was led to believe, when the parties entered into the Agreement. It is even in less of a position to defend claims that Xenomics believes should be self evident, that the harm to Xenomics' testing pipeline, ability to raise capital and reputation has caused Xenomics millions of dollars of damages.

Accordingly, Xenomics is hereby notifying Sequenom that the Agreement is terminated immediately insofar as Sequenom's breach is not capable of being cured within thirty (30) days, for the reasons described above. The foregoing is without waiver of or prejudice to any other rights or remedies available to Xenomics, at law, in equity or otherwise, against Sequenom and anyone acting in concert with it, all of which are hereby expressly reserved.

In the event Sequenom accepts this termination in the next three business days and returns all warrants issued to Sequenom as part of the Agreement, Xenomics is prepared to consider releasing Sequenom from additional claims for damages. Please confirm receipt of this letter by facsimile to (732) 438-8299 and direct any questions to me at (619) 316-9656 or to our outside general counsel, Herb Sommer, at 516 228-8181 Ext. 21.

Very truly yours,


Thomas H. Adams, Ph.D.
Chairman

cc:     Ivor Elrifi, Esq. (Mintz Levin - NY)
        Herbert H. Sommer, Esq.
        Gary Anthony, VP and Controller

EXHIBIT L



ROPES & GRAY LLP
1211 AVENUE OF THE AMERICAS
NEW YORK, NY 10036-8704
WWW.ROPESGRAY.COM

May 29, 2009

Harry Rubin
212-596-9105
646-728-2651 fax
harry.rubin@ropesgray.com

VIA FEDEX

Thomas H. Adams, Ph.D.
Chairman
Xenomics Inc.
One Deer Park Drive, Suite F
Monmouth Junction, NJ 08852

Dear Dr. Adams:

We are counsel to Sequenom, Inc. This letter is in response to your letter of May 20, 2009 to Clarke Neumann with respect to the Xenomics-Sequenom License Agreement dated October 29, 2008 (the "Agreement").

Your letter constitutes wrongful termination and is a clear bad faith attempt to get out of the Agreement without any legal basis and in clear contravention of the express terms of the Agreement.

Under Section 10.1 of the Agreement, Xenomics would have the right to terminate the Agreement (and the license granted to Sequenom under it) only if Sequenom were in material breach of (i) any of its representations, warranties or covenants in Section 7.2 (which, per Section 9.4, are the only applicable express or implied warranties) or (ii) any other material obligation of the Agreement. Sequenom has rigorously complied with all of its representations, warranties and covenants in Section 7.2, and all of its other obligations under the Agreement. Therefore, there is absolutely no basis for your termination of this Agreement.

Even if there were such breach – and there has been none – Sequenom, under Section 10.2 of the Agreement, would have a thirty-day cure right. Nothing in the Agreement gives you the right to terminate immediately for an alleged "breach" you unilaterally declare "not capable of being cured."

Contrary to your false allegations, at no point during any negotiations did Sequenom misrepresent anything to Xenomics nor did Sequenom fail to disclose to Xenomics any material facts known to Sequenom at that time. Moreover, at all times Sequenom was and, as evidenced by its faithful compliance with the Agreement, Sequenom remains fully capable of performing and has been performing all of its contractual obligations. Indeed, Xenomics has been enjoying all the benefits of Sequenom's full performance, including Xenomics' receipt from Sequenom of the contractually required $1,000,000 licensee fee. No other payments to Xenomics are due or owing until the minimum royalty payments begin in 2010. Those payments are not due until 2011. We, therefore, find your false allegation that Sequenom has denied Xenomics the benefit of the Agreement utterly absurd.

ROPES & GRAY LLP

Thomas H. Adams, Ph.D.                    - 2 -                    May 29, 2009

Xenomics has also failed to abide by Section 11 of the Agreement which requires good faith consultations to resolve any disputes between the parties and subsequent arbitration in the event that such resolution is not achieved.

Your contentions rely on baseless, unacceptable and offensive conclusions as to Sequenom and its conduct and policies. Sequenom rejects your letter entirely and expects Xenomics to continue abiding by the Agreement which remains in full force and effect.

Sequenom considers your letter an extremely serious matter and will use all available remedies, including legal process, to ensure the continuing implementation of the Agreement in accordance with its terms.

Sincerely,

Harry Rubin

HR:jg

cc: Clarke W. Neumann, Esq.
    General Counsel
    Sequenom, Inc.
    James F. Haley, Esq.

EXHIBIT M

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

## FORM 8-K

### CURRENT REPORT
### PURSUANT TO SECTION 13 OR 15(d) OF THE
### SECURITIES EXCHANGE ACT OF 1934

Date of report (Date of earliest event reported): September 29, 2009

# SEQUENOM, INC.
#### (Exact Name of Registrant as Specified in Charter)

| DELAWARE | 000-29101 | 77-0365889 |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

3595 JOHN HOPKINS COURT
SAN DIEGO, CALIFORNIA 92121
(Address of Principal Executive Offices)

(858) 202-9020
(Registrant's telephone number, including area code)

N/A
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K is intended to simultaneously satisfy the filing obligations of the registrant under any of the following provisions ( *see* General Instruction A.2. below):

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Item 8.01      Other Events.

Following our announcement on September 28, 2009 regarding the completion of the independent investigation by the special committee of our board of directors, representatives of Nasdaq and the Office of the U.S. Attorney for the Southern District of California separately contacted us to inquire about our announcement. We intend to cooperate fully with Nasdaq and with the U.S. Attorney. We have met with representatives of the U.S. Attorney and the Federal Bureau of Investigation in connection with their investigations. In addition, members of the special committee and its independent counsel have met with the Enforcement Staff of the Securities and Exchange Commission in connection with its investigation.

2.

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Date: October 5, 2009

SEQUENOM, INC.

By: _____  /s/   CLARKE W. NEUMANN
Clarke W. Neumann
Vice President and General Counsel

3.

Created by Morningstar Document Research    documentresearch.morningstar.comSource: SEQUENOM INC, 8-K, October 05, 2009

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

XENOMICS, INC.,

Plaintiff,

-against-

SEQUENOM, INC.,

Defendant.

Summons and Verified Complaint

Jaroslawicz & Jaros, LLC
225 Broadway, 24th Floor
New York, New York 10007
(212) 227-2780

By: _____
David Jaroslawicz

NEW YORK
COUNTY CLERK'S OFFICE

OCT 2 8 2009

NOT COMPARED
WITH COPY FILE