EXHIBIT B



*Xenomics Inc.*
One Deer Park Drive
Suite F
Monmouth Junction, NJ 08852
732.438.8290

May 22, 2009

<u>Facsimile (858-202-9020)</u>

Clarke W. Neumann, Esq.
General Counsel
Sequenom, Inc.
3595 John Hopkins Court
San Diego, CA 92121

Re: <u>Xenomics-Sequenom License Agreement</u>

Dear Mr. Neumann:

As you are aware, Xenomics entered into a License Agreement with Sequenom dated October 29, 2008 (the "Agreement") under which Xenomics licensed to Sequenom certain Xenomics technology for commercialization by Sequenom. Sequenom filed a Form 8-K with the Securities and Exchange Commission on April 29, 2009, and issued a press release which disclosed, among other things, that Sequenom's SEQureDx Down syndrome research and development test data and results were materially compromised due to employee mishandling. Worse, the Form 8-K report states that, as a consequence, Sequenom no longer has confidence in <u>any</u> of its test data, and, in addition to initiating an independent investigation of the SEQureDx Down syndrome matter, is currently reviewing its research and development test data for <u>all</u> tests.

Moreover, Xenomics has also learned that, as a result of these developments and an apparent loss of faith and trust in the company, Sequenom's shareholders have filed several class action lawsuits in the United States District Court for the Southern District of California, asserting, among other things, that Sequenom has defrauded them.

This is a matter of grave concern to Xenomics and threatens severe direct and consequential damages as a result of Sequenom's conduct. Xenomics entered into the Agreement after being led to believe that Sequenom possessed (i) the resources, technical expertise and scientific discipline and (ii) quality of reputation needed to promote effectively Xenomics' technology in the marketplace. However, the recent shocking events involving Sequenom, including intentional misconduct of its own employees, demonstrate beyond doubt that, in fact, Sequenom lacked the scientific discipline, technical expertise and, now, reputation, that it represented during our negotiations of the Agreement. What relevant reputation and qualities Sequenom may have had at the time we negotiated the Agreement, Sequenom has now clearly lost. The failure of Sequenom to disclose to Xenomics, during our discussions while negotiating the Agreement, the facts that have come to light only recently constitute material omissions of facts which expose Xenomics to potentially millions of dollars of damages.

Xenomics intent and purposes in entering into the Agreement was to license the right to use Xenomics' patented technology and know-how to Sequenom, which (i) would enable Sequenom, using its professed resources and scientific expertise in the field, to develop Licensed Diagnostic Products and Licensed

2 | May 20, 2009

Research Products based on Xenomics' technology, (ii) to commercially exploit such Licensed Products, in each case, as contemplated under Section 2.1 of the Agreement using Sequenom's professed marketing acumen and industry and market reputation, and (iii) generate royalty revenue for Xenomics pursuant to Section 4 of the Agreement. However, the recent public admissions of data irregularities makes it abundantly clear that Sequenom, at the time it entered into the Agreement, was neither capable nor intending to perform its development and marketing obligations under the Agreement. It has also become clear that Sequenom's concealed misconduct will have the result of denying Xenomics the benefits of its Agreement with Sequenom, which constitutes a breach by Sequenom of the covenant of good faith and fair dealing inherent in the Agreement, and will cause devastating harm to Xenomics and its shareholders.

Sequenom needs to focus its undivided attention on its internal investigation, restoring order in its own house, weeding out untrustworthy employees, determining which data are or are not reliable, attempting to regain trust and confidence of investors and the medical marketplace--which very well may be impossible--and defending the numerous class action lawsuits. Sequenom is not well-positioned to market Xenomics' technology as was represented, and as Xenomics was led to believe, when the parties entered into the Agreement. It is even in less of a position to defend claims that Xenomics believes should be self evident, that the harm to Xenomics' testing pipeline, ability to raise capital and reputation has caused Xenomics millions of dollars of damages.

Accordingly, Xenomics is hereby notifying Sequenom that the Agreement is terminated immediately insofar as Sequenom's breach is not capable of being cured within thirty (30) days, for the reasons described above. The foregoing is without waiver of or prejudice to any other rights or remedies available to Xenomics, at law, in equity or otherwise, against Sequenom and anyone acting in concert with it, all of which are hereby expressly reserved.

In the event Sequenom accepts this termination in the next three business days and returns all warrants issued to Sequenom as part of the Agreement, Xenomics is prepared to consider releasing Sequenom from additional claims for damages. Please confirm receipt of this letter by facsimile to (732) 438-8299 and direct any questions to me at (619) 316-9656 or to our outside general counsel, Herb Sommer, at 516 228-8181 Ext. 21.

Very truly yours,


Thomas H. Adams, Ph.D.
Chairman

cc:   Ivor Elrifi, Esq. (Mintz Levin - NY)
      Herbert H. Sommer, Esq.
      Gary Anthony, VP and Controller